Evelyn V. Keyes, Justice
In this accelerated appeal, appellants, M.G. ("Mother") and J.R.G. ("Father"), challenge the trial court's final decree, entered after a bench trial to a master, awarding the Department of Family and Protective Services ("DFPS") permanent managing conservatorship of their four children, J.J.G., L.K.G., H.A.G., and A.G.G. A panel of this Court reversed the trial court's decree and DFPS filed a motion for en banc reconsideration. We now grant DFPS's motion for en banc reconsideration, withdraw our opinion of August 4, 2016, vacate our judgment of the same date, and issue this en banc opinion and judgment in their stead. See TEX. R. APP. P. 49.7.
In challenging the trial court's decree naming DFPS as the children's managing conservator, Mother contends on appeal that the trial court erred: (1) by failing to appoint her as the children's managing conservator, or alternatively, as their possessory conservator; and (2) by failing to approve the master's recommended judgment without hearing more evidence and applying Government Code section 54.817 in such a way that it denied her due process protections. Father contends on appeal that the evidence was legally and factually insufficient to support the trial court's determinations that (1) appointing him as the children's joint managing conservator *48 would significantly impair the children's physical health or emotional development; and (2) the best interest of the children was served by appointing DFPS as the children's managing conservator.
Because we conclude that the evidence was sufficient to support the trial court's determination that naming either parent as managing conservator would significantly impair the children's physical health or emotional development and that naming DFPS as their managing conservator was in the children's best interest, we overrule Mother's first issue and Father's issues on appeal. We further conclude that Mother failed to preserve any complaint regarding the trial court's application of the rules governing the use of a master in cases such as this case, and, accordingly, we overrule Mother's second issue on appeal.
We affirm the final decree of the trial court.
Background
This case was filed by DFPS on February 5, 2014, after the youngest child, A.G.G., sustained life-threatening injuries attributable to abuse. DFPS removed all of the children from Mother's home. At that time, J.J.G. was three years old, L.K.G. was two years old, H.A.G. was less than two years old, and A.G.G., the injured child, was seven months old. DFPS created family service plans for both Mother and Father, and both parents participated in the services ordered as part of the family service plans and had visitation with the children.
DFPS believed that both Mother and Father failed to make adequate progress to justify reunifying them with their children. Accordingly, on December 1, 2014, DFPS amended its petition to seek managing conservatorship of the children and termination of Mother's and Father's parental rights. The case was tried before a master on July 10 through 13, 2015.
At the bench trial, DFPS presented evidence regarding the circumstances under which the children came to be in DFPS's care. DFPS received a referral that A.G.G., who was seven months old at the time, had been physically abused by an "unknown perpetrator." A.G.G. had been under the care of several different caregivers, including Mother, at the time he sustained his injuries. Mother could not provide an explanation for A.G.G.'s injuries, which included brain bleeding, broken bones, and bruising. DFPS concluded that A.G.G.'s injuries constituted a "non-accidental trauma" and were "consistent with abuse and/or neglect."
Dr. Reena Isaac, a physician on the child protection medical team at Texas Children's Hospital, testified that she examined A.G.G. after Mother brought him to the hospital on January 23, 2014. Dr. Isaac diagnosed him as "a victim of abusive head trauma," noting that he had several skeletal injuries, two subdural hematomas, a cerebral contusion on the left side of his head, significant retinal hemorrhages in both of his eyes, and scratches on his back. A.G.G. also had a recent subdural hematoma around the back of his head and a more remote one on the frontal area of his head, indicating that he had suffered head trauma on more than one occasion. The recent subdural hematoma had likely occurred within one to three days of his arrival at the hospital, and the more remote subdural hematoma had likely occurred at least several weeks prior to that. Dr. Isaac noted that the subdural hematomas were markers of head injuries caused by acceleration and deceleration forces applied to A.G.G. In other words, "the child's head [was forced to] mov[e] very rapidly and then stop[ped] suddenly."
*49 According to Dr. Isaac's Physician's Statement, which was also admitted into evidence, Mother reported several different incidents as possible explanations for A.G.G.'s severe injuries. Mother recounted an incident that occurred several days before Dr. Isaac's examination in which A.G.G., who had been strapped into his car seat, fell when the car seat dislodged while Mother was driving her car. Mother also described an incident in which A.G.G. had fallen off a bed while at home with her. Dr. Isaac concluded that neither of the incidents described by Mother could have caused A.G.G.'s subdural hematomas because they could not have generated the rapid acceleration and deceleration forces necessary to cause the hematomas that had occurred in his brain. Nor could these incidents have caused the retinal hemorrhaging found in A.G.G.'s eyes. In short, Mother's story was inconsistent with the evidence of A.G.G.'s injuries at the hands of an unknown perpetrator.
Dr. Isaac also testified that A.G.G. had suffered fractures to both of his distal tibias, i.e., "the long bones of the legs near the ankles," sclerosis, or an injury to one of the bones within his left foot, and an impaction fracture on his right radius. The fractures to the tibias, approximately seven to ten days old, were likely to have occurred at the same time as the result of a direct application of force in a twisting motion. Dr. Isaac testified that the force that caused the fractures was greater than any force required for the normal care of a child. Although Mother reported to Dr. Isaac that A.G.G. "may have gotten [his] legs caught in [his] crib," Dr. Isaac testified that such an occurrence would not have explained his leg injuries, which were more serious and intentional. She also stated that A.G.G.'s siblings were unlikely to have caused any of his injuries with the possible exception of some of the bruises or scratches on his back, which were superficial. A.G.G.'s injuries were serious, would have been caused by "significant force," and were likely caused by an adult.
The evidence at trial, including the testimony of both Mother and DFPS caseworker Nicole Franco, demonstrated that three people had cared for A.G.G. during the time he sustained his serious injuries: Mother, her sister-in-law Veronica, and her friend Nelly. Neither Dr. Isaac nor DFPS and police investigators were able to determine which of these three adults had abused A.G.G., and at the time of trial, two-and-one-half years later, the investigation was ongoing, with Mother remaining a suspect.
At the time of trial, A.G.G. was legally blind and had trouble walking. A.G.G.'s siblings, J.J.G., L.K.G., and H.A.G., did not show signs of abuse or neglect at the time they were removed from Mother's care. The DFPS investigator described them as "awake, alert[,] and very active," and concluded they "appeared to be healthy and developmentally on target for their ages." At that time, the family had no prior history of drug or alcohol abuse, mental illness, domestic violence, or past or current involvement with law enforcement or DFPS. Dr. Isaac reported that A.G.G.'s siblings had been examined by the medical staff at the hospital and found to be healthy, although the children were anemic and at least one of them was underweight.
Franco acknowledged that the issues with A.G.G.'s siblings were not severe enough by themselves for DFPS to have removed the children from Mother's care. However, she also testified that, at the time of trial, each child had his or her own "unique special need." J.J.G. required speech therapy and participated in individual play therapy; L.K.G. required speech therapy and individual play therapy; H.A.G. required speech therapy, was not *50 potty-trained, and required "PPCD," which is "[s]upport services through ... school"; and A.G.G. required continued treatment by an ophthalmologist, additional surgery "around the age of five" related to his eyes, and occupational, physical, and speech therapy. Franco also noted that J.J.G. and L.K.G., who were five years old and four years old respectively, did not want to go home to Mother or Father.
Dianne Del Sol, the owner of the day-care facility the children were attending at the time of trial, testified that J.J.G. was almost four years old when DFPS removed him from Mother's custody and he started at the facility. At that time, he was very shy, "not capable of having social interactions with the rest of the children," "spoke very little English," "did not know his shapes, colors, [or] numbers," "did not know how to write his name," and was not "potty trained." However, he could speak Spanish, was "verbal in the Spanish language," and did not have a "speech delay." J.J.G. was "withdrawn to himself, doing his own activities," and, while there was nothing wrong with that, at his age, he should have been developing social connections with others.
Del Sol further testified that, initially, L.K.G., who was almost three years old when she started at the day-care facility, had "emotional outburst[s]" and "would cry for no reason." H.A.G., who was "less than two years old" when she started at the facility, was also difficult to deal with. She would "sit there and just cry with her mouth hanging open and slobber dro[o]ling down," and she could not be consoled. Del Sol noted, however, that such behavior could have been occurring due to her missing her mother. A.G.G., who was less than one year old when he began at the day-care facility, did not have crying outbursts and easily interacted with the other children. However, he had a difficult time walking and his vision was impaired.
Del Sol testified that, while in the care of DFPS, J.J.G., L.K.G., and H.A.G. had received speech therapy, and A.G.G. had received therapy for walking. At the time of trial, the children were no longer experiencing delays in development. J.J.G. was very outgoing, was speaking well, and knew his colors, shapes, and numbers. L.K.G. was also doing well, was doing her class work, and was interacting with her friends. H.A.G. "still ha[d] a lot of ... emotional distress," but not nearly to the same extent. And A.G.G. was very well adjusted, although he struggled with his vision and his walking was "a little uneven," which required him to be watched closely.
Mother testified that she met Father in November 2008 and became pregnant with J.J.G. in 2009. At that time, she was not aware that Father was married to another woman. While she was pregnant, she saw Father every once in a while, but he provided no support for Mother before or during her pregnancy with J.J.G. After J.J.G. was born on March 3, 2010, Mother saw Father "more frequently" and became pregnant with L.K.G., who was born on March 5, 2011. Although Father did not provide Mother with any financial assistance before or during her pregnancy with L.K.G., she continued to see him. After H.A.G. was born on June 7, 2012, Father "started to help" Mother because she "told him he really needed to help" as "there were more children, more expenses, and more responsibility." She explained that she had not previously asked Father for financial assistance because she was working and things were not difficult financially. After the birth of H.A.G., Father gave Mother some money each month until March 2013, while she was pregnant with A.G.G., when he told her that he had to *51 move to Mexico. Mother next saw Father in January 2014, seven months after A.G.G. was born on May 31, 2013, and prior to A.G.G.'s being injured. After Father returned in January 2014, he again paid child support, pursuant to a court order, in the time leading up to the trial.
Mother opined that Father was a good father who loved the children and paid attention to them. However, she admitted that it was not responsible for him to disappear for long periods of time and that that indicated that he was not there for his children. When Father did visit the children, it was usually for two or three hours, once or twice a week. When he visited, he watched movies with the children, played with them, and devoted time to them. Mother testified that Father had visited J.J.G., specifically, many times.
Mother testified that she was employed as a cook at a restaurant, where she had worked for the past seven years. She worked in the mornings for thirty-five to forty hours per week and had previously worked at night from approximately 4:00 p.m. or 5:00 p.m. to 11:00 p.m. or 11:30 p.m. She stated that if the children were returned to her, she would continue to work "[j]ust mornings." Although she had help from her family, namely her brothers and sisters-in-law and her friend Nelly, in caring for her children, she had raised her four children essentially by herself prior to their removal by DFPS.
Regarding her plans for caring for the children if they were returned to her, Mother testified that she had looked into day care for the children-specifically Sharpstown Day Care-which the children would attend while she worked. She stated that if the children were returned to her, she would be picking them up from school, bathing them, and helping them with their homework.
Regarding the events surrounding A.G.G.'s injuries, the evidence at trial demonstrated that Mother had sought medical care for A.G.G. as his symptoms worsened in the days leading up to his hospitalization. She originally noticed that he had a cough, and she took him to his regular doctor, who noted that A.G.G. seemed normal and was not in apparent distress. However, when A.G.G. became more ill and vomited several times, Mother took him to the hospital, where the extent of his injuries was discovered. Mother testified that she did not harm A.G.G. or any of her children. She also denied narcotics and alcohol abuse, a psychological history, a criminal history, and a DFPS history, and there was no evidence contradicting these assertions. Mother was also aware that A.G.G. now requires special care and will need additional surgery related to his eyes.
At the time of trial, Mother testified that she had consistently attended her supervised visits with the children and had brought them food or gifts. The children were "very loving" towards her and would tell her, "[M]ommy we love you. I love you.... We want to go with you." According to Mother, Franco-the DFPS caseworker who testified that J.J.G. and L.K.G. did not want to go home to Mother or Father-had never been present for any of her visits with the children. Mother acknowledged that, other than therapy sessions she had with the children, she had been allowed to see the children for only two hours per month after they were taken into custody by DFPS.
Mother had completed many, but not all, requirements of her family service plan. She was required to participate in and successfully complete individual therapy. She was initially discharged from individual therapy sessions "due to minimal progress." However, DFPS had referred her for more therapy to work on her parenting *52 skills, and she was still participating at the time of trial. Mother had completed her required psychosocial evaluation, had completed her required parenting classes, and had provided DFPS with certification of her completion of her classes. She continued to work on implementing the parenting skills that she had learned during her family therapy sessions with the children.
Mother's psychotherapist, Gabriela Morgan, testified that Mother had attended both individual counseling and family therapy with her, approximately once a week, for more than a year. Morgan opined that Mother's behavior in the sessions was cooperative and attentive.
Morgan's therapy notes reflected that Mother denied injuring A.G.G. on numerous occasions and initially stated that she had no idea how her baby got hurt. Over time, as she progressed in therapy, Mother indicated that she believed that Veronica had hurt A.G.G. This concerned Morgan because, two or three months prior to these statements, Mother had indicated that her relationship with Veronica was close, they talked a lot, and Veronica was part of her support system. However, at trial, Mother contradicted this testimony. She stated that, although she thought that Veronica had hurt A.G.G., she could not say so for certain because she "didn't see her harming him or injuring him." Mother also testified that she had a good relationship with Veronica, who was still married to Mother's brother. She saw Veronica and talked to her sometimes, but she did not see her on holidays because Mother did not go out on holidays; she just worked. Mother also testified that Veronica was not part of her support system any more, and that, after A.G.G. was injured, she quit turning to Veronica for help.
Morgan testified that Mother became overwhelmed and highly stressed when around the children. Morgan testified that Mother struggled because "when she is with one [child] she can't seem to direct her attention to anything else and that's when the kids start roaming and moving around and doing other stuff." However, Mother cared for and loved her children, and her love for her children seemed genuine. Morgan testified that J.J.G. in particular was bonded with Mother, although she had not seen the other children cry for their mother. Furthermore, Mother was not homicidal, suicidal, or aggressive. Morgan characterized Mother's risk of violence to be "very low or absent."
Father had had much more limited interactions with the children. He had not engaged in regular visitation with the children and had not provided regular financial support. Father testified that he had seven children, three of whom were over eighteen and the youngest four of whom were the subjects of this case. He explained that, although he had been in a relationship with Mother for approximately seven years, he was married to another woman. He testified that until two years before trial he had been a loving father, but he had not assumed responsibility for the children. However, within the last two years, while the DFPS case was pending, he had become "a little closer" to the children and had taken responsibility for the expenses Mother incurred because of the children.
Father stated that he had no concerns about any physical danger to the children if they were returned to Mother. He had never seen any indication that the older children, J.J.G., L.K.G., and H.A.G., were not well provided for when they lived with Mother. However, he also testified that he had concerns at one point regarding Veronica's care for A.G.G. that arose after he observed some small bruises or other minor injuries on A.G.G. He stated that, following A.G.G.'s hospitalization, he was not *53 initially involved in the DFPS case because he did not think that it involved him, and he had been told that he had nothing to do there. Father testified that he loved the children; he was concerned when he heard that A.G.G. was in the hospital; J.J.G., L.K.G., and H.A.G. were all bonded with him; and A.G.G. was beginning to bond with him.
At the time of trial, Father was living with his wife, a woman other than Mother. Father's wife had said that the children could not live in their home, but she had also stated that she would be willing to have two of the children live there. However, Father testified that he would move with the children somewhere alone, get an apartment, and provide them with stable housing if they were returned to him. He also testified that, during the pendency of this case, he had moved out of the home he shared with his wife, but he had subsequently moved back for financial reasons and because one of his older daughters was having problems. He testified that his oldest daughter's three children and his other two older children all lived in the home that he shared with his wife.
These facts concerned DFPS. Franco cited Father's lack of active participation and lack of a "desire to care for all four of his children," She also observed that Father did not "have a place to go with all four children," so DFPS was concerned that he would simply return the children to Mother. DFPS was further concerned because Father did not attend a required permanency hearing on May 19, 2015. And he had attended only three out of approximately twenty-two scheduled visits with the children since he had been served in the case.
Furthermore, despite the fact that Franco had discussed his family service plan with him, Father failed to complete it. He did not provide verification to DFPS about his employment or housing. Father also failed to provide DFPS with certification of his participation in parenting classes, although he had indicated to Franco that "he had done some of the classes ... [and] only had a few more of them to do." Father participated in the required psychosocial assessment, but he had not participated in family therapy. Morgan, the therapist, noted that Father attended several sessions with her and that Father was forthcoming and clear, and it appeared to Morgan that he "wanted to work on a plan for the kids and [to] be clear about where he stood." Morgan opined that it was not possible for Father to parent all four children and "he would be able to take [only] two." And she noted that he did not participate in any therapy with the children through Morgan's services.
Regarding other potential caregivers or conservators for the children, Franco opined that both Veronica and another woman, Norma, whom Mother had identified as a placement for the children after A.G.G. was injured, were inappropriate caregivers for the children. DFPS had never been provided with appropriate contact information to speak with Veronica. And, although DFPS had placed A.G.G. with Norma for four months after he was injured, placement with Norma in the future would be inappropriate because there was an individual in Norma's home who had had a recent DWI arrest. No other potential caregivers for the children were identified. Franco opined that it was in the best interests of the children for parental rights to be terminated or for the children to remain in the custody of DFPS.
The master found that DFPS did not establish the grounds for termination of Mother's or Father's parental rights to the children. The master further found that DFPS did not meet its burden to obtain *54 permanent managing conservatorship of the children. The master ordered that Mother and Father be named joint managing conservators of the children and Mother be designated the primary joint managing conservator. And the master ordered that the children be immediately returned to their parents.
DFPS then filed with the trial court a Motion to Stay the Return of the Children and a Motion for Reconsideration of the Master's Ruling.
By a final decree rendered on January 21, 2016, the trial court appointed DFPS as the permanent managing conservator of the children and denied Mother and Father possessory conservatorship, without terminating the parental rights of either Mother or Father. Specifically, the trial court held that DFPS "did not prove a ground for termination and/or that termination is in the best interest of the subject children by clear and convincing evidence." However, it also found that (1) "appointment of a parent or both parents as managing conservator would not be in the best interest of the children [J.J.G., L.K.G., H.A.G., and A.G.G.], because the appointment would significantly impair the children's physical health or emotional development"; and (2) "it would not be in the best interest of the children to appoint a relative of the children or another person as managing conservator."
The court refused to appoint either Mother or Father as a possessory conservator of the children because it found that "such appointment would not be in the best interest of the children." The trial court entered additional orders with respect to Mother. It required her to "complete a psychological evaluation and follow any and all recommendations"; to "maintain legal and verifiable employment"; to "refrain from engaging in any illegal criminal activities"; to "remain in contact or meet with caseworker at least one time per month to provide an update on services, child well-being, etc." throughout the time DFPS remained permanent managing conservator of the children; if available, to "complete a special needs parenting class in Spanish that is at least six to eight weeks in length," or to "identify and participate in a volunteer program through a nonprofit organization and/or medical facility aimed at assisting and/or caring for special needs children," and to complete twenty-five hours of volunteer service with that organization, with either program to be completed by July 15, 2016; to "attend all non-emergency medical visits for her children," including "medical appointments with any specialists and routine doctor visits"; to "obtain, pay for and maintain appropriate housing" and to provide all pertinent information necessary to assess its appropriateness to her caseworker as provided in the order; to "continue participating in family therapy sessions until successfully discharged by her therapist"; to "attend any and all scheduled visitations with the subject children"; to "develop a support system of at least three individuals"; to "contact the children at least one time per week on the phone number provided by the foster parents"; and to "provide minimum wage child support according to the guidelines set forth in the Texas Family Code to the children." Each of these provisions contained detailed instructions for its performance.
The trial court entered similar additional orders with respect to Father.
The trial court appointed DFPS as "Sole Managing Conservator" and ordered that DFPS have the rights of a sole managing conservator as stated in the final decree. It further ordered that the children "continue in care" and that "this Court will continue to review the placement, progress and welfare of the children." Accordingly, it ordered *55 that the appointed attorney and guardian ad litem for the children be continued in that relationship "for the purposes of representing the child[ren] at the Review Placement hearings that may be held after the final disposition of this suit as authorized by § 107.016, Texas Family Code."
Both parents timely appealed the trial court's final decree.
The Trial Court's Conservatorship Determination
Mother and Father both challenge the trial court's conservatorship determination, asserting that it erred in failing to name either parent as managing or possessory conservator and instead naming DFPS as the children's managing conservator. Mother and Father argue that the evidence was legally and factually insufficient to support the trial court's findings that appointment of either parent or both parents as managing conservator "would significantly impair the children's physical health or emotional development" or that such an appointment was not in the children's best interest.
A. The Law Governing Conservatorship Determinations
Conservatorship determinations made after a bench trial are "subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." In re J.A.J. , 243 S.W.3d 611, 616 (Tex. 2007). To determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without reference to any guiding rules or principles, that is, whether its decision was arbitrary or unreasonable. Low v. Henry , 221 S.W.3d 609, 614 (Tex. 2007) ; In re M.M.M. , 307 S.W.3d 846, 849 (Tex. App.-Fort Worth 2010, no pet.). "An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence," nor does an abuse of discretion occur so long as there is some evidence of substantive and probative character to support the trial court's decision. In re M.M.M. , 307 S.W.3d at 849 (citing In re Barber , 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding), and Butnaru v. Ford Motor Co. , 84 S.W.3d 198, 211 (Tex. 2002) ).
Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. E.g. , Moore v. Moore , 383 S.W.3d 190, 198 (Tex. App.-Dallas 2012, pet. denied) ; Dunn v. Dunn , 177 S.W.3d 393, 396 (Tex. App.-Houston [1st Dist.] 2005, pet. denied). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. Stamper v. Knox , 254 S.W.3d 537, 542 (Tex. App.-Houston [1st Dist.] 2008, no pet.) ; Gardner v. Gardner , 229 S.W.3d 747, 751 (Tex. App.-San Antonio 2007, no pet.).
In conducting a legal sufficiency review in conservatorship cases, an appellate court reviews all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. City of Keller , 168 S.W.3d at 810, 827. In reviewing a no-evidence point, the appellate court must view evidence in the light that tends to support the finding of the disputed fact, and it must disregard all evidence and inferences to contrary.
*56 Lewelling v. Lewelling , 796 S.W.2d 164, 166 (Tex. 1990). If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then the fact-finder must be allowed to do so. City of Keller , 168 S.W.3d at 822. A reviewing court cannot substitute its judgment for that of the fact-finder, so long as the evidence falls within this zone of reasonable disagreement. Id. The trial court is in a better position to decide custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." In re J.R.D. , 169 S.W.3d 740, 743 (Tex. App.-Austin 2005, pet. denied).
The Family Code provides extensive guidance for courts making conservatorship determinations. Section 153.002 provides, "The best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2014). Section 153.005 authorizes the appointment of a managing conservator and provides that the managing conservator must be "a parent, a competent adult, an authorized agency, or a licensed child-placement agency." Id. § 153.005 (West Supp. 2016). Finally, section 153.131 creates a rebuttable presumption that a parent shall retain custody of a child. It provides,
Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.
Id. § 153.131(a) (West 2014). The parental presumption under Section 153.131 is removed when there is a "finding of a history of family violence involving the parents of a child." Id. § 153.131(b).
Section 153.131 is expressly made subject to Family Code section 153.004, which provides another exception to the parental presumption. See id. § 153.131(a). Section 153.004(b), relevant to this case, provides:
It is a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child or as the conservator who has the exclusive right to determine the primary residence of a child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child.
TEX. FAM. CODE ANN. § 153.004(b).
Under the plain language of sections 153.131(a) and 153.004(b), the parental presumption is replaced by the opposite presumption-i.e., that appointment of a neglectful or abusive parent as possessory conservator is not in the child's best interest-upon a showing of credible evidence that the parent has a history or pattern of past or present child neglect or physical abuse. See id. §§ 153.004(b), 153.131(a).
To rebut that presumption, such a parent must produce evidence that her appointment will be in the child's best interest. See id. § 153.002 ; cf. Dubai Petroleum Co. v. Kazi , 12 S.W.3d 71, 80-81 (Tex. 2000) (discussing shifting burdens of proof with respect to rebuttable presumptions). This is shown by evidence supporting the Holley factors, namely:
(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;
*57 (3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individual seeking custody;
(5) the programs available to assist the individual to promote the best interest of the child;
(6) the plans for the child by the individual or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent, or potential conservator, that may indicate that the existing relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent or potential conservator.
Holley v. Adams , 544 S.W.2d 367, 371-72 (Tex. 1976) (listing factors often used for determining best interest of child); see also In re Doe 2 , 19 S.W.3d 278, 282 n.20 (Tex. 2000) (recognizing that intermediate appellate courts use Holley factors to ascertain best interest of child in conservatorship cases).
Accordingly, for the court to award managing conservatorship to a non-parent, the non-parent must prove by a preponderance of credible evidence that appointing a parent as a possessory conservator would result in significant physical or emotional impairment to the child. See TEX. FAM. CODE ANN. § 153.131(a).
Family Code section 263.404 governs a trial court's appointment of DFPS as a child's managing conservator without the termination of parental rights, and it allows the trial court to render a final order appointing DFPS as a child's managing conservator if the court finds that: (1) a parent's appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development and (2) the appointment of a relative of the child or another person would not be in the child's best interest. TEX. FAM. CODE ANN. § 263.404(a) (West Supp. 2016); see In re J.A.J. , 243 S.W.3d at 614.
B. The Evidence Supporting the Trial Court's Final Decree
Here, the trial court determined that appointing either one of the children's parents as conservator would not be in the children's best interest because the appointment would significantly impair the children's physical health or emotional development, and it relied on evidence of specific acts or omissions of the parents in reaching its conclusion. See, e.g. , TEX. FAM. CODE ANN. § 263.404(a) ; see also In re J.A.J. , 243 S.W.3d at 614 ; Lewelling , 796 S.W.2d at 167.
Regarding evidence to support the trial court's finding that appointment of Mother as possessory conservator would significantly impair the children's physical health or emotional development, the children were removed from Mother's home because A.G.G., a seven-month-old infant, had received life-threatening injuries sustained over a period of time in the preceding weeks that left him legally blind, requiring eye surgery that had not yet happened at the time of trial, and with difficulty walking due to having his legs broken through severe force. The DFPS investigator averred that, at the time he was injured, A.G.G. had been under the care of several different caregivers including Mother, and Mother could not provide an explanation for A.G.G.'s injuries, which included brain bleeding, broken bones, and bruising. The DFPS investigator concluded that A.G.G.'s injuries constituted a "non-accidental trauma" and were "consistent with abuse and/or neglect." Dr. Isaac diagnosed A.G.G. as "a victim of abusive head trauma," noting that he had several skeletal injuries, two subdural hematomas, *58 a cerebral contusion on the left side of his head, significant retinal hemorrhages in both of his eyes, and scratches on his back. Dr. Isaac also testified that A.G.G. had suffered fractures to both legs, an injury to one of the bones within his left foot, and an impaction fracture on his right radius. The medical professionals and social workers who saw A.G.G. testified that his injuries could only have been intentionally inflicted by an adult, and the evidence demonstrated that the abuse occurred either while he was in Mother's care or in the care of a person with whom Mother left him.
Furthermore, Mother failed to adequately explain the cause of A.G.G.'s repeated abuse. Mother identified several incidents as possible explanations for A.G.G.'s serious injuries. Mother told Dr. Isaac that, five days prior to his arrival at the hospital A.G.G., who had been strapped into his car seat, fell when the car seat dislodged while Mother was driving her car. According to Mother, A.G.G. had remained strapped in his car seat, was fine, and ate and drank properly afterwards. Mother also stated that, four days before he arrived at the hospital, A.G.G. had fallen off a bed while at home with Mother. Mother stated that she had consoled him after the fall and did not see any obvious changes to him at that time. Dr. Isaac concluded that neither of the incidents described by Mother could have caused A.G.G.'s subdural hematomas because they could not have generated the rapid acceleration and deceleration forces necessary to cause the hematomas that had occurred in his brain. Nor could these incidents have caused the retinal hemorrhaging found in A.G.G.'s eyes. Regarding A.G.G.'s leg fractures, Mother reported to Dr. Isaac that A.G.G. "may have gotten [his] legs caught in [his] crib," but Dr. Isaac testified that such an occurrence would not have explained his leg injuries, which were more serious and intentional. In short, Mother's story was inconsistent with the evidence of A.G.G.'s injuries, which had occurred over a time that he was in her care.
Regarding the other children, J.J.G., L.K.G., and H.A.G., the evidence demonstrated that, although they were all active and showed no signs of physical abuse at the time they were removed from Mother's care, they all had anemia and J.J.G. was underweight. Each child had his or her own "unique special need." J.J.G. required speech therapy and participated in individual play therapy; L.K.G. required speech therapy and individual play therapy; H.A.G. required speech therapy, was not potty-trained, and required support services through school; and A.G.G. required continued treatment by an ophthalmologist, additional future surgery related to his eyes, and occupational, physical, and speech therapy. All of these needs were being met in the children's current placement, but Mother did not provide any evidence, beyond her mere assertions, that she could continue to meet these needs if the children were returned to her or Father. Thus, evidence of the emotional and physical needs of the children and of the emotional or physical danger to them if returned to the parents supports the trial court's determination here.
Regarding Father, he and Mother both testified that he had not consistently been a part of the children's lives, had not provided them with regular financial support, and had not consistently visited with them or formed a bond with them. Father explained that, although he had been in a relationship with Mother for approximately seven years, he was married to another woman. At the time of trial, Father was living with his wife. She had said that the children could not live in their home, but she had also stated that she would be *59 willing to have two of the children live there. Father admitted that he left while Mother was pregnant with her first child, J.J.G., and that, after a brief reconciliation, he again left Mother after the second child, L.K.G., was born. Likewise, when Mother was three months pregnant with A.G.G.-i.e., in October 2012, when H.A.G. was four months old-he "stayed away from her about three or four months," which would mean that he saw her in February 2013, a month before he moved to Mexico in March 2013. The record indicates that Father did not see Mother or the children between March 2013, two months before A.G.G. was born, and January 2014, two weeks before A.G.G. was injured. Finally, Father testified that had seen the children only six or seven times after they were taken into the custody of DFPS. This constitutes at least some evidence supporting the trial court's determination that he had neglected his children.
Although the children in this case are quite young, it was also proper for the trial court to consider their desires and any evidence regarding their bond with their parents. Franco testified that J.J.G. and L.K.G., who were five years old and four years old respectively, did not want to go home to Mother or Father. Morgan likewise testified that only J.J.G. was bonded with his mother and that Father had not participated in any therapy with the children through her. The only testimony that the children desired to be removed from their placement in their foster home and returned to Mother came from Mother's own testimony and was directly contrary to Franco's testimony. And there was no evidence that any of the children desired to live with Father, who had had almost no contact with them, missed numerous scheduled visits with them, and testified he had no home to which to take them or could take only two, at most.
Finally, no evidence indicates that Mother and Father had developed the parental abilities necessary to care for their special-needs children or that they had otherwise demonstrated an ability to provide the care and stability necessary for the children's wellbeing. See Holley , 544 S.W.2d at 371-72. Mother and the two caregivers with whom she had left A.G.G. during the time that he endured life-threatening abuse remained suspects in an open criminal investigation at the time of trial. Although there was expert testimony that Mother's own aggressiveness and likelihood of hurting the children was low, she had made up stories to explain away each injury and identified the other suspect-caretakers as part of her support group. Moreover, there was limited evidence that she had any other support group or that she would not return the children to the same caregivers while she worked. Father showed up once at the hospital after A.G.G. was injured, but he stayed away afterwards and also failed to involve himself in the court proceedings that were initiated to investigate the children's circumstances on the ground that he was not involved with their care.
It is also significant in this regard that Mother admitted that, apart from family therapy sessions, she had had only supervised contact with the children for two hours a month since their removal from her home more than two years before trial. Morgan, Mother's therapist, testified that Mother became overwhelmed and highly stressed when around all four children. Also, Mother struggled because "when she is with one [child] she can't seem to direct her attention to anything else and that's when the kids start roaming and moving around and doing other stuff," even though she cared for and loved her children, and her love for her children seemed genuine.
*60 At the time of trial, Mother had not moved to housing suitable for the children, although she testified she had put down a deposit on a two-bedroom apartment. She worked full-time, previously at night and, at that time, "mornings." She had made no day care arrangements for the children beyond visiting one near her home, although she intended to place them in day care. Mother did not identify an adequate support system, and Franco testified DFPS was concerned that she had none, other than the previous caregivers she had used, who were likewise suspects in the investigation into A.G.G.'s injuries.
Franco stated that DFPS was concerned about Mother's judgment in terms of the children's care, including Mother's decision to leave the children with inappropriate caregivers and Mother's excuses for A.G.G.'s injuries as being due to his falling in his car seat or falling off the bed. Franco also testified that DFPS was likewise concerned about awarding possession of the children to Father because of fears that he would simply return the children to Mother and because he had not actively participated in the children's lives, lacked a desire to care for all four of his children, and did not have a place to go with them.
Franco also testified that Mother and Father had not completed their family service plans. Mother was required to participate in and successfully complete individual therapy. Franco had referred Mother for more therapy to work on her parenting skills, and Mother was still participating in that therapy at the time of trial. Although Mother had completed her required psychosocial evaluation and required parenting classes, she continued to work on implementing the parenting skills she had learned. Father likewise left several aspects of his parenting plan uncompleted, including participating in individual therapy and providing proper documentation of stable employment and housing.
The foregoing evidence supports a determination that DFPS presented credible evidence of a history or pattern of past child neglect, or physical abuse by each parent directed against the other parent, a spouse, or a child. See TEX. FAM. CODE ANN. §§ 153.004(b). It therefore was a rebuttable presumption that appointing either parent as a possessory conservator was not in the best interest of the children. Id. Furthermore the evidence supported the trial court's decision that appointing either parent as a managing conservator would significantly impair the children's physical health or emotional development. See TEX. FAM. CODE ANN. § 153.131(a). The evidence is likewise sufficient to support the trial court's findings that appointing either parent as managing conservator was not in the children's best interest and that appointing DFPS as managing conservator was in the children's best interest. See TEX. FAM. CODE ANN. §§ 153.002, .004(b), .131(a); Holley , 544 S.W.2d at 371-72.
Mother argues that the evidence demonstrated that she did not hurt A.G.G. and could not have anticipated that Veronica would injure A.G.G. However, this misconstrues the evidence. The record reflected that Mother remained a suspect in the ongoing investigation into who had injured A.G.G. Mother and Father also argued that there were no indications of injury or neglect to A.G.G.'s siblings, that they had substantially complied with the terms of their family service plans, that they were gainfully employed, and that they did not have a history of drug or alcohol abuse, domestic violence, or mental illness.
These arguments rely on a misapplication of the appropriate standard of review and standard of proof in conservatorship proceedings. Family Code section 151.131 and its accompanying provisions *61 concerning the appointment of a conservator impose a "more general standard" than that imposed by the Family Code section 161.001, which sets out the statutory requirements for involuntary termination of parental rights. In re J.A.J. , 243 S.W.3d at 616. The supreme court in In re J.A.J. expressly recognized that "the evidence supporting termination under ... section 161.001(1) could be insufficient, and at the same time still support the determination that appointment of a parent as conservator would impair the child's physical health or emotional development...." Id.
Here, none of the parties challenge the trial court's denial of DFPS's claim seeking termination of Mother's or Father's paternal rights. But even though the trial court determined that record did not contain clear and convincing evidence supporting termination, it was within the trial court's purview to determine that a preponderance of that same evidence established that appointing either parent as conservator would impair the children's physical health or emotional development. Id.
In reviewing conservatorship determinations, we use an abuse-of-discretion standard and may reverse the trial court's decision only if it is arbitrary and unreasonable. Id. (stating that "a 'finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance' ") (quoting In re C.H. , 89 S.W.3d 17, 25 (Tex. 2002) ). An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence, nor does an abuse of discretion occur so long as there is some evidence of substantive and probative character to support the trial court's decision. In re M.M.M. , 307 S.W.3d at 849.
The trial court had before it sufficient evidence on which to exercise its discretion, including the fact that Mother or a caregiver selected by her subjected A.G.G. to severe abuse over a period of several weeks that resulted in two subdural hematomas, two broken legs, injuries to his foot, and an impaction fracture to his arm. The trial court could have concluded that Mother's explanation for these injuries was not credible, and the evidence showed that Mother remains one of the suspects in the ongoing investigation into A.G.G.'s abuse. And nothing in the record indicated that Mother was prepared to care for her four children-all of whom had some kind of special need-on a full-time basis. Likewise, the evidence indicates that Father effectively abandoned his children for lengthy periods of time to Mother's care and that he had had minimal involvement in their lives. This evidence and the other evidence discussed above constitutes more than a scintilla of evidence of a pattern of behavior to support the judicial findings that placing the children back into either Mother's or Father's care would significantly impair their physical health or emotional development, and it demonstrates that the trial court did not err in the application of its discretion on this issue. See ids="7328393" index="33" url="https://cite.case.law/sw3d/307/846/#p849">id. ; see also TEX. FAM. CODE ANN. § 153.004(b) (creating presumption that appointment of parent as managing conservator is not in child's best interest "if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child").
Considering all of the relevant evidence, including "evidence of misconduct in the more distant past, evidence of more recent misconduct, and evidence of the stability of the child[ren's] current placement," we conclude that there is more than a scintilla of evidence supporting the trial court's final decree. We further conclude that the *62 evidence is factually sufficient to support the trial court's final decree. For, even considering the contrary evidence-such as Mother's efforts to complete her family service plan and the fact that her therapist considers her a low risk for violence-the evidence supporting the trial court's findings is not so weak as to be clearly wrong and manifestly unjust. See Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).
Thus, the trial court did not abuse its discretion in making its conservatorship determination in this case.[1]
We overrule Mother's first issue and Father's first and second issues on appeal.
Trial Court's Rejection of Master's Recommended Judgment
In her second issue on appeal, Mother argues that the trial court denied her due process protections by failing to approve the master's recommended judgment without hearing more evidence and by applying Government Code section 54.817.
The Government Code provides for the referral of certain Harris County cases involving juveniles to a master. See TEX. GOV'T CODE ANN. §§ 54.801 -.820 (West 2013); see id. § 54.808 (judge may refer to master any civil case or portion of case brought in connection with Rule of Civil Procedure 308a, governing suits affecting parent-child relationship). "After a hearing is concluded, the master shall send to the referring judge all papers relating to the case and the written findings of the master." Id. § 54.816. The Government Code further provides:
(a) After the court receives the master's report, the court may adopt, modify, correct, reject, or reverse the master's report or may recommit it for further information, as the court determines to be proper and necessary in each case.
(b) If a judgment has been recommended, the court may approve the recommendation and hear more evidence before making its judgment.
Id. § 54.817. "The finding and recommendations become the decree or judgment of the court when adopted and approved by an order of the judge." Id. § 54.818.
Here, Mother complains that the trial court erred in not taking additional evidence upon deciding to reject the master's recommended judgment and that, by rejecting or reversing the master's judgment without an additional hearing, the trial court denied her due process protections. However, Mother failed to make any complaint regarding this issue in the trial court. To preserve a complaint for appellate review, an appellant must show (1) she made the complaint to the trial court by a timely request, objection, or motion, and (2) the trial court ruled on the request or refused to rule on the request and appellant objected to the refusal. See TEX. R. APP. P. 33.1(a) ; see also *63 In re B.L.D. , 113 S.W.3d 340, 350 (Tex. 2003) (observing, in context of parental rights termination, that "applying our preservation rules" generally does not deprive parties of due process rights); In re M.J.M.L. , 31 S.W.3d 347, 352 (Tex. App.-San Antonio 2000, pet. denied) ("Constitutional issues must be properly raised in the trial court or they are waived on appeal."). Because Mother failed to make a timely complaint regarding the trial court's failure to hear more evidence upon rejecting the master's recommended judgment or otherwise raise a concern regarding her due process rights in the trial court, she waived this issue on appeal.
We overrule Mother's second issue on appeal.
Conclusion
We affirm the order of the trial court.
Justice Jennings, joined by Justice Higley, dissenting with separate opinion.
Justice Lloyd, dissenting without opinion.
OPINION DISSENTING FROM THIS COURT'S ORDER GRANTING EN BANC RECONSIDERATION AND THIS COURT'S EN BANC JUDGMENT

The trial court retains jurisdiction to modify a conservatorship order when it is in the child's best interest and the parent's circumstances have changed materially and substantially. In re J.A.J. , 243 S.W.3d 611, 617 (Tex. 2007) ; see Tex. Fam. Code Ann. § 156.001 (West 2014) (providing that court with continuing exclusive jurisdiction may modify order providing for conservatorship, support, possession of, or access to child); itation index="43" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%20156.001">id. § 156.101 (West 2014) (providing grounds for modifying order establishing conservatorship or possession and access); id. § 156.002(b) (West 2014) (stating that person who has standing to sue under Chapter 102 may file suit for modification). Thus, in affirming the trial court's final decree, we leave the trial court to implement its order stating that it will "continue to review the placement, progress and welfare of the children" and to exercise its continuing jurisdiction to modify a conservatorship order when it is in the children's best interest and the parent's circumstances have changed materially and substantially. See Tex. Fam. Code Ann. § 156.001 ; In re J.A.J. , 243 S.W.3d at 617.