

## Fourth Court of Appeals

### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-21-00161-CV

**IN THE INTEREST OF J.G.I.G.**

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2019-PA-01378
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:   Rebeca C. Martinez, Chief Justice

Sitting:       Rebeca C. Martinez, Chief Justice
               Beth Watkins, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: September 15, 2021

AFFIRMED

Appellant A.A. ("Father") appeals the trial court's final order in a suit affecting the parent-child relationship designating him as a possessory conservator rather than a managing conservator of his child, J.G.I.G.[1]  We affirm.

### BACKGROUND

J.G.I.G. was born in January 2017.  In July 2019, the Texas Department of Family and Protective Services (the "Department") petitioned for removal of J.G.I.G., then two years old, while he was living with his mother, L.D.A. ("Mother").  It was reported that Mother smoked marijuana daily, that she would leave J.G.I.G. unsupervised, that J.G.I.G. cut himself with a razor

---

[1] To protect the identity of the minor child, we refer to the parents and the child by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

due to poor supervision, and that Mother had not taken J.G.I.G. to any medical appointments in the three months prior to the report. The Department also had concerns about Father because he was not involved in J.G.I.G.'s life, was living with his girlfriend ("Girlfriend") who had pending criminal charges at the time, and was unwilling to have Girlfriend move out so that J.G.I.G. could live with him. After removal, the Department was designated J.G.I.G.'s temporary managing conservator, and J.G.I.G. was placed with his maternal aunt ("Aunt"). In July 2020, the case proceeded to a bench trial. The Department sought termination of both Mother's and Father's parental rights.

The Department's removing caseworker, Beverly Garza, testified that at the time of removal and for several months after, it was not safe for J.G.I.G. to be under the control or care of Mother or Father. She testified that Father was asked to come up with a plan to ensure the safety of J.G.I.G. but was unable to do so. The Department's conservatorship caseworker, Briana Booth, testified that there were concerns with Father's level of participation in his parent-child visits because Father was absent for the first year and a half of J.G.I.G.'s life. When Father eventually began to engage in visits, he did not bond with J.G.I.G. Booth stated that Father missed several of his visits with J.G.I.G. On one occasion, Father left a visit because he was upset that Girlfriend was not able to participate. Booth stated that Father had the opportunity to have J.G.I.G. placed with him at the beginning of the case, but it did not happen because Father was not willing to have Girlfriend, who faced criminal charges at the time, move out of his home. To Booth, this was troublesome because Father was the primary provider in his household and J.G.I.G. would be under the care of Girlfriend while Father was working. Due to the violent nature of Girlfriend's charges and her failure to participate in the actions required to determine the safety of Father's home, the Department believed Girlfriend posed a threat to J.G.I.G.

Booth testified that J.G.I.G had been staying with Aunt since the beginning of the case, was flourishing there, and had a strong bond with Aunt's family. Booth also testified that even if the court decided the Department failed to prove its case for termination of parental rights as to both parents, it still would want J.G.I.G. to continue in the care of Aunt because it was not safe for him to return to the care of Mother or Father. Booth testified that if Mother or Father were offered rights as possessory conservator, the Department would request that any visitation be supervised.

After Booth's testimony, the parties announced that they agreed to reset the case for several months to allow Aunt to qualify for Permanency Care Assistance financial benefits and to continue to offer services to Mother and Father. The trial court announced it would be in recess. On January 22, 2021, trial resumed.

During the second part of trial, J.G.I.G.'s counselor, Elizabeth Milvo, testified that J.G.I.G. was doing well while living with Aunt, was developing in a healthy manner, and had developed a bond with Aunt and her family. She testified that J.G.I.G.'s connection with his Aunt and her home were imperative to his growth and that taking him out of his home would significantly impair his emotional development. Milvo also testified that Father engaged in only two out of the three parent-child visits and that J.G.I.G. did not seem attached to Father during these visits. Her assessment of J.G.I.G. was that he appeared to be a neglected child. She went on to state that Father did nothing to prepare a safe living situation for J.G.I.G. and was incapable of arranging any medical appointments for J.G.I.G.

Department caseworker Booth continued her testimony. She explained that Mother had made domestic violence allegations against Father, and that Father's failure to intervene in J.G.I.G.'s life while he was living with Mother before the removal action was a form of neglect. She further testified that Father refused to take possession of J.G.I.G. when the Department first

became involved, and that he had failed to complete all of the requirements on his family service plan, such as individual therapy and a court-ordered drug assessment.

Mother voluntarily relinquished her parental rights in November 2020 and asked the court to accept that document as grounds for termination of her parental rights. Mother testified that Father had many opportunities to be involved in J.G.I.G.'s life and failed to do so; she stated that Father would not pick up J.G.I.G. for various reasons such as preoccupation with his other children or work. She also described two domestic violence incidents between Father and her. On the first occasion, Mother and Girlfriend were in a physical fight, and Mother "shoved [Father] and he put his hands around [Mother's] throat." During the second incident, Father confronted Mother in his home while fighting about J.G.I.G. and Father's other children. Father "pulled [her] from [her] hair" while J.G.I.G. was laying down with her. Father's brother eventually took J.G.I.G. and the other children out of the room while Father "just tried pinning [Mother] down and pulling [her] hair." Mother then stated that she tried to defend herself and they "ended up on the floor, [and Father] . . . was on top of [her on] the floor."

Father explained that he was not part of J.G.I.G.'s life because of Mother's involvement in an abusive relationship with her boyfriend at the time. He testified that Mother's boyfriend was constantly calling and making threats, which made it impossible for Father to pick up J.G.I.G. without being threatened. Father stated that because of this, he felt the best decision was "just to avoid everything" and "push [him]self away from that." Father discussed the two domestic violence incidents Mother testified about and admitted that during the first incident, he grabbed Mother on the waist and pulled her back, but "it wasn't in a way to be physically abusive towards her. It was to stop the fight that was going on." For the second incident, Father testified that there was a confrontation between him and Mother, but that it was only verbal and there was no physical contact or force other than slamming doors and yelling at each other. He conceded that he was

late to most of the parent-child visits with J.G.I.G., but stated it was because of his work obligations. He testified that his relationship and involvement with J.G.I.G. had been slowly improving and that he now had a bond with J.G.I.G. Father testified that he and Girlfriend could provide J.G.I.G. with a safe and stable environment and that he was in the process of looking for a home larger than his current one-bedroom apartment. He stated he would be willing to pay $100 a month if Aunt and her husband ("Uncle") were appointed permanent managing conservators of J.G.I.G.

After the trial concluded, the trial court signed a final order terminating Mother's parental rights and appointing Aunt and Uncle as J.G.I.G.'s permanent managing conservators and Father as possessory conservator. The trial court found that appointing Father as managing conservator would not be in the best interest of J.G.I.G. because it would significantly impair the child's physical health or emotional development, and that appointing Aunt and Uncle as permanent managing conservators was in the best interest of J.G.I.G. The trial court granted Father possession of and access to J.G.I.G. at times mutually agreed upon in advance by the parties. In the absence of mutual agreement, Father would have visits on the first and third Saturday and Sunday of the month for two hours at KidShare, or supervised visitation as per mutual agreement with the managing conservators. The trial court also ordered Father to pay Aunt and Uncle $200 per month in child support.

Father appeals, arguing the trial court abused its discretion by failing to appoint him as managing conservator.

## STANDARD OF REVIEW

We review a trial court's determination as to conservatorship for an abuse of discretion. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "Under that standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but are relevant in

assessing whether the requisite abuse of discretion is present." *In re E.M.T.*, No. 04-18-00805-CV, 2019 WL 1370323, at *2 (Tex. App.—San Antonio Mar. 27, 2019, no pet.) (mem. op.). "A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles." *In re M.G.N.*, 491 S.W.3d 386, 406 (Tex. App.—San Antonio 2016, pet. denied). A trial court does not abuse its discretion if it bases its decisions on conflicting evidence or if "there is some evidence of substantive and probative character to support the trial court's decision." *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). We defer to the trial court's credibility determinations, review the evidence in the light most favorable to the order, and indulge every presumption in favor of the trial court's ruling. *In re E.M.T.*, 2019 WL 1370323, at *2; *In re I.G.W.*, No. 04-17-00161-CV, 2018 WL 3265292, at *1 (Tex. App.—San Antonio July 5, 2018, no pet.) (mem. op.).

### APPLICABLE LAW

A managing conservator is the person or entity who, by court order, has been awarded custody of a child and may determine the child's primary residence. *See* TEX. FAM. CODE ANN. § 153.371 (1), (10); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, no pet). The managing conservator has nearly sole authority to make decisions for the child. *See* TEX. FAM. CODE ANN. § 153.371. A managing conservator must be (1) a parent, (2) a competent adult, (3) the Department, or (4) a licensed child-placing agency. *Id.* § 153.005(b). The trial court is required to appoint a parent as sole managing conservator or both parents as joint managing conservators unless it finds that appointment of one or both parents as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. *Id.* § 153.131(a).

There is a rebuttable presumption that appointment of the parent of a child as managing conservator is in the best interest of the child, but the presumption is removed upon a finding of a

history of family violence involving the parents. *Id.* § 153.131(b). The party seeking appointment of a non-parent as managing conservator bears the burden to rebut the presumption in favor of the child's parents. *In re K.S.*, 492 S.W.3d 419, 427 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The nonparent may rebut the presumption with affirmative proof, by a preponderance of the evidence, that appointing the parents as managing conservator would significantly impair the child, either physically or emotionally. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *see* TEX. FAM. CODE ANN. § 153.131(a). Usually, the nonparent must identify some act or omission committed by the parent that demonstrates that naming the parent as managing conservator will significantly impair the child's physical health or emotional development. *See* TEX. FAM. CODE ANN. § 153.131(a); *In re S.T.*, 508 S.W.3d 482, 491–92 (Tex. App.—Fort Worth 2015, no pet.). Evidence of acts or omissions that may constitute significant impairment include, but are not limited to, abandonment of a child, a failure to support the child, and a failure to remove a child from an unstable environment. *In re R.F., Jr.*, No. 04-17-00582-CV, 2018 WL 1308542, at *2 (Tex. App.—San Antonio Mar. 14, 2018, no pet.) (mem. op.); *see In re C.R.T.*, 61 S.W.3d 62, 67 (Tex. App.—Amarillo 2001, pet. denied) (holding that evidence of mother's drug problem, abandonment of her children, failure to provide support, and dependence upon her parents for her well-being evinced potential impairment of health and emotional development sufficient to justify the appointment of a third-party as managing conservator instead of a parent).

### DISCUSSION

Here, the trial court found appointment of Father as managing conservator would not be in the best interest of J.G.I.G. because the appointment would significantly impair J.G.I.G.'s physical health or emotional development. Father contends there is insufficient evidence to support this finding. We hold that there is substantial evidence that Father's appointment as managing

conservator would significantly impair J.G.I.G.'s physical health and emotional development. *See* TEX. FAM. CODE ANN. § 153.131(a).

The evidence at trial shows that Father did not have contact with and failed to provide support for J.G.I.G. for the first year and a half of his life. *See In re R.F., Jr.*, 2018 WL 1308542, at *4 (using evidence that father had no contact with child and provided no emotional support for approximately three years as evidence to support the trial court's finding that appointing father as a managing conservator would significantly impair the child's physical health or emotional development). The Department's conservatorship caseworker testified that Father's absence from J.G.I.G.'s life has made it difficult for he and J.G.I.G. to have a bond. *See In re J.C.*, 346 S.W.3d 189, 194 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("As a reviewing court, we may consider concepts of psychological parenting, bonding, and the depth of attachments to parental figures in the context of the evidence presented.").

Father also failed to intervene or provide a stable home for J.G.I.G. when he was aware of the conditions J.G.I.G. lived in with Mother. *See Thomas v. Thomas*, 852 S.W.2d 31, 36 (Tex. App.—Waco 1993, no writ) (holding trial court did not abuse its discretion by failing to appoint child's father as a managing conservator where father knew about mother's drug and alcohol abuse, yet father "did not intervene for over three years and provided no support."). J.G.I.G. was removed from Mother due to allegations that Mother smoked marijuana daily, would leave J.G.I.G. unsupervised, that J.G.I.G. cut himself with a razor due to poor supervision, and that Mother had not taken J.G.I.G. to a medical appointment in three months. The Department's caseworker testified that Father was aware of these conditions and failed to intervene or provide a home for J.G.I.G. because he was not willing to meet the Department's request of having Girlfriend, who faced criminal charges, move out of his home. Father testified that he was not a part of J.G.I.G.'s life when J.G.I.G. lived with Mother prior to removal because of Mother's involvement in an

abusive relationship with her boyfriend at the time. He testified that Mother's boyfriend was constantly calling and making threats, and that because of this, he felt the best decision was "to avoid everything" and not interact with J.G.I.G. *See In re R.F., Jr.*, 2018 WL 1308542, at *3–4 (using evidence that father knew child was in a household with mother who used or sold drugs and that father failed to make any attempts to regain custody of child as evidence supporting trial court's finding that appointing father as managing conservator would significantly impair child's physical health or emotional development); *cf. Thomas*, 852 S.W.2d at 36 ("[A]llowing a child to remain in an unstable environment is the type of conduct that can significantly impair emotional development.").

The evidence also shows that, even after the first year and a half of J.G.I.G.'s life, Father was not involved in J.G.I.G.'s life and failed to complete the requisite services in order to have possession of J.G.I.G. *Cf. In re Hidalgo*, 938 S.W.2d 492, 497 (Tex. App.—Texarkana 1996, no writ) (holding evidence that mother, who was separated from child at birth, who did not have contact with child for several years, and who did not take full advantage of her opportunities to bond with child, supported trial court's conclusion that appointment of mother as sole managing conservator "would significantly impair the emotional development of the child."). Mother testified that Father had many opportunities to be involved in J.G.I.G.'s life, but he failed to do so. One of the Department's caseworkers testified that although Father engaged in some services, he and Girlfriend failed to attend a sufficient number of therapy sessions to determine the safety of the family dynamics or the structure of the household. She also testified that Father failed to complete all the requirements on his family service plan, such as individual therapy and a court-ordered drug assessment.

The trial court heard testimony that Father had a history of domestic violence, which sometimes occurred in front of J.G.I.G. *See* TEX. FAM. CODE ANN. § 153.131(b) ("A finding of a

history of family violence involving the parents of a child removes the presumption" that appointment of the parents as joint managing conservators is in the best interest of the child). Mother described two domestic violence incidents between her and Father. While Father presented some conflicting testimony on the incidents and how they occurred, the trial court was able to base its decision on Mother's testimony. *See In re T.D.C.*, 91 S.W.3d 865, 878 (Tex. App.—Fort Worth 2002, pet. denied) ("An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.") (citation omitted).

Finally, the trial court heard testimony that J.G.I.G. was thriving with Aunt, who was appointed managing conservator with Uncle. J.G.I.G.'s counselor testified that J.G.I.G. was doing well in his foster home with Aunt, was developing in a healthy manner, and was attached to Aunt's family. She testified that it was imperative for J.G.I.G.'s growth that he maintain this connection with Aunt and her household and that taking him out of his home would significantly impair his emotional development. *See In re C.R.T.*, 61 S.W.3d at 67–68 (affirming trial court's appointment of non-parent as managing conservator because of evidence of parent's neglect, along with evidence that non-parent provided stability, support, and a positive environment for the child).

Evidence of Father's neglect and history of domestic violence coupled with evidence of stability, support, and nourishment offered by Aunt and Uncle support the trial court's finding that appointing Father as managing conservator would significantly impair J.G.I.G.'s physical health or emotional well-being. *See* TEX. FAM. CODE ANN. § 153.131; *see also In re R.F., Jr.*, 2018 WL 1308542, at *4. Therefore, we cannot say that the trial court's conservatorship determinations were arbitrary, unreasonable, or an abuse of discretion.

## CONCLUSION

We affirm the trial court's judgment.

Rebeca C. Martinez, Chief Justice