**Opinion issued April 21, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00964-CV

————————————

**SHELBY WRIGHT, Appellant**

**V.**

**MARK BERGER, Appellee**

---

**On Appeal from the 387th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 12-DCV-199166**

---

## MEMORANDUM OPINION

In its final decree of divorce, the trial court appointed Shelby Wright and Mark Berger joint managing conservators of their eight-year-old son, W.B. Although W.B. had lived with Shelby in Dallas from the age of two until the age of eight, the trial court gave Mark the exclusive right to designate W.B.'s primary residence in Fort

Bend County or a neighboring county. The court also gave Mark the exclusive right to make decisions concerning W.B.'s education, after consultation with Shelby. On appeal, Shelby argues that the court's decision was not supported by legally and factually sufficient evidence, and therefore it was an abuse of discretion.

We affirm.

## Background

Shelby and Mark married in March 2010, when Shelby was pregnant with W.B. Shelby moved to Missouri City, Texas shortly before W.B. was born in June 2010. Two years later, Shelby filed for divorce and moved to Dallas with W.B.

For the following six years, Shelby maintained W.B.'s primary residence in Dallas, and she and Mark shared custody under temporary orders. They met midway between their homes to exchange possession of W.B. Mark had possession of W.B. odd weekends, spring break, and during extended periods in the summer.

The record demonstrates that both Shelby and Mark are fit parents, and the court appointed them joint managing conservators.[1] The record also demonstrates

---

[1] According to the record, Shelby was W.B.'s primary caretaker for the first eight years of his life. She fed him, bathed him, maintained his routine, and put him to bed at night. She made a home for him when they moved to Dallas, enrolled him in daycare, and ensured he received medical care as needed and was covered by medical insurance. She took him to museums, made crafts with him, and encouraged his interest in rock collecting. She also played with him, taught him, travelled with him, and promoted his relationships with his grandparents, aunt, and uncle, who lived nearby. None of this is disputed.

2

that both Shelby and Mark contributed to the ongoing discord in their relationship.[2]

Shelby sometimes failed to communicate relevant information in a timely manner, telling Mark about appointments or events, such as Taekwondo belt testing, after the fact. Shelby sometimes prevented W.B. from accepting video chats or phone calls or told him to end the conversation to do chores or take a bath. Shelby informed W.B.'s school that because she was W.B.'s primary caretaker under the temporary court orders, any communication it had with Mark had to be shared with her as well.

---

The record also reflects that Mark consistently paid child support and shared the cost of health insurance for W.B. as well as enrichment activities like Taekwondo and Boy Scouts. He remained actively involved in W.B.'s life, traveling to Dallas to attend school activities with W.B. or parent-teacher conferences. He called W.B. daily by phone or video chat. Mark also promoted a relationship between W.B. and Mark's girlfriend, Jaime Parrish, whom Mark intended to marry, and Jaime's son, who was close to W.B.'s age. Mark travelled with W.B. and engaged in building hobbies with him, like playing with Legos and building robots.

Mark worked with W.B. during his periods of possession on reading readiness before kindergarten, and later he ensured W.B. did homework on weekends and practiced reading over summer vacation. He also worked with W.B. on math fluency. Later, he looked for tools, such as colored overlays, to help W.B. read despite his dyslexia. None of these facts are disputed.

[2] The record demonstrates that over the years, Shelby and Mark disagreed about parenting and questioned each other about matters such as the choice of pediatrician; whether, when, and how to treat minor medical conditions such as rashes; the presence in the home of overnight guests; travel plans during extended periods of possession; home safety issues, including safe storage of a gun, securing a backyard swimming pool, usage of a car seat or a booster seat, use of a space heater in the home; and possession or return of items that were given to W.B. before the age of two or left at one parent's house. They also disputed Shelby's tardiness to exchange possession of W.B., disruptions in the schedule due to inclement weather, and making up missed visitation time. The existence of these disagreements is not disputed.

When Shelby's possession of W.B. was disrupted due to inclement weather, she sought makeup time, but when Mark's possession of W.B. was likewise disrupted, Shelby told him that the court order did not provide for makeup time.

Mark berated Shelby when she was late to arrive at their midway meeting point, recorded their conversations at all handoffs, and tracked W.B.'s whereabouts using an iPad he gave him. Mark frequently criticized Shelby for lack of communication, but sometimes Mark ignored Shelby and her parents when they all attended events for W.B. or when exchanging possession of W.B.

At trial, Shelby testified that Mark was controlling and manipulative; but Mark acknowledged that Shelby's communication was sometimes sufficient, and he expressed regret for having berated her about being late to exchange possession of W.B.

Mark supported W.B.'s relationship with Shelby, inviting Shelby and her parents to W.B.'s birthday parties, which were always during Mark's period of extended summer possession. He also invited Shelby to join them and other members of his family to celebrate Christmas in Colorado; offered to travel to Dallas to take W.B. to doctor's appointments; offered to pay for a hotel to allow Shelby and W.B. to stay near the handoff location when he believed a predicted ice storm made travelling back to Dallas treacherous; ensured that W.B. called Shelby during Mark's periods of possession; and provided an itinerary to Shelby when he travelled with

W.B. Because Shelby is a public-school counselor, Mark chose his periods of extended summer possession to maximize Shelby's summer vacation time with W.B.

By contrast, Shelby made disparaging remarks about Mark to W.B. More than four months before trial, she told W.B. that Mark wanted him to move to Missouri City and go to another school. At one point, W.B. told Mark that moving and going to another school would "ruin my life." Shelby testified that it would be "just devastating" to W.B. if he were to move to his father's house, and she worried W.B. would fall into a deep depression if that happened. W.B. told Mark that, when he was with his mother, he felt that his parents did not get along, and W.B. once told Shelby: "I wish you and daddy would just get along." Shelby discouraged W.B.'s growing relationship with Jaime. Shelby testified at trial that Mark called W.B. too frequently. Shelby and her parents testified that Mark's periods of possession were excessive, should be curtailed, and disrupted family routines. Shelby called Mark's efforts to work with W.B. on reading over the summer "excessive." Shelby testified that W.B. regresses when he is with Mark by sucking his fingers, clinging to a favorite blanket, and occasionally calling his father "Dada." She also complained that Mark "babied" W.B. by continuing to carry him around when he was six years old.

Shelby, Mark, and other trial witnesses testified that W.B. is a smart boy who is liked by adults and peers. W.B. struggled during his first few years of school; by the end of kindergarten, W.B. began to lag behind his peers in reading skills. Shelby testified that W.B.'s reading was on level in first grade, but his teachers expressed concern about his lack of focus and distractibility. Shelby sought a referral from W.B.'s pediatrician for evaluation for attention deficit hyperactivity disorder (ADHD). Despite Mark's work with him over the summer, W.B.'s reading level dropped between the end first grade and the start of second grade. In the fall of second grade, W.B.'s educators referred him for testing, and he was diagnosed with dyslexia. The school provided instruction using the Scottish Rite Take Flight program to address W.B.'s dyslexia.

Meanwhile, the trial court had appointed Fort Bend area psychologist, Dr. Cynthia Mellor-Crummey, to complete a custody evaluation. Dr. Mellor-Crummey met with Shelby four times and with Mark six times. In an email to both parents, Dr. Mellor-Crummey stated: "I typically meet with parents alone about 4 times each but I will meet additional times if either parent has concerns they wish to discuss with me. This option is open to both parents equally and I respond when you reach out to me with concerns you wish to discuss." Only Mark availed himself of the offer. At trial, Shelby testified that Dr. Mellor-Crummey "didn't explain to me that I had the opportunity to communicate with her at any time."

6

As part of her custody evaluation, Dr. Mellor-Crummey administered psychological evaluations; accepted letters from their friends, relatives, neighbors, and coworkers; observed W.B. individually, with Shelby, and with Mark; reviewed educational assessments from W.B.'s school; spoke to educators from W.B.'s school; visited the parents' homes; reviewed W.B.'s medical records; and sought additional behavioral and educational assessments.[3]

Dr. Mellor-Crummey requested additional information, including a behavioral checklist to be completed by Shelby, Mark, and W.B.'s teachers as a screening tool for ADHD; vision screening and an eye exam from an ophthalmologist; and a psycho-educational assessment. At trial, Shelby admitted that she opposed the behavioral checklists sent to the schools and she initially told the principal and educators not to fill out the forms. Shelby was reluctant to take W.B. to see an optometrist, believing the screening by his pediatrician was sufficient. Shelby opposed the psycho-educational evaluation that was performed by Emily

---

[3]    Dr. Mellor-Crummey produced an 80-page report summarizing her observations and the information she reviewed. Dr. Mellor-Crummey attributed the length of time that was required to complete the evaluation to difficulty scheduling with Shelby, due to inflexibility in her work schedule and the distance between Fort Bend County and Dallas. Dr. Mellor-Crummey noted that although Shelby participated in the custody evaluation, she was reluctant and at times uncooperative on payment, scheduling, not allowing W.B., who was in kindergarten and first grade at the time, to miss school to participate in the court-ordered evaluation. She also noted that Shelby had concluded that the process was biased against her and "openly expressed her frustration and disagreement" with Dr. Mellor-Crummey.

Waltmon, M.Ed., and she was skeptical of the results. Waltmon determined that W.B. had mild-to-moderate dyslexia and mild dysgraphia, a learning disability with impairment in written expression. Among other things, she recommended that W.B. be evaluated by an occupational therapist for handwriting issues or fine motor skills. Shelby opposed an occupational therapy evaluation because the school had not recommended it. In an email to Dr. Mellor-Crummey, Waltmon recommended that W.B. attend the Briarwood School if he were in the Houston area. Mark applied for W.B.'s admission to the Briarwood School, and W.B. was accepted for the following year. Shelby opposed sending W.B. to the Briarwood School because it specializes in teaching children with learning disabilities, and she was concerned that W.B. would be stigmatized.

Dr. Mellor-Crummey reported that Shelby had lied to her. For example, Shelby said that Mark did not discuss his concerns about W.B. over the phone with her. But Mark produced an audio recording of one such conversation that lasted more than an hour. Dr. Mellor-Crummey concluded Shelby "wants to present a particular view of her life" with W.B. and distorts or lies about information that would contradict that view.

At the beginning of second grade and while Dr. Mellor-Crummey was completing her custody evaluation, Shelby began taking W.B. to see a licensed professional counselor, Dr. Kelly Webb-Ferebee, Ph.D. At trial, Shelby

acknowledged that she had sought a therapist who would testify in the "current custody battle" to ensure that W.B.'s best interest was represented. Shelby continually communicated with Dr. Webb-Ferebee about the ongoing litigation, and Shelby paid a lawyer to represent the therapist at her deposition. In an email to Dr. Mellor-Crummey, Dr. Webb-Ferebee described W.B.'s relationship with Shelby in positive terms. She praised W.B.'s school district as one of the "top . . . in the state." She minimized concerns about W.B. possibly having dyslexia, calling his reading and writing difficulties "[d]evelopmentally" "well within the normal range." Though Dr. Webb-Ferebee had not met Mark and had spoken to him only once by phone, she was "extremely concerned about the possible harmful effects of a custody battle." She opined that it would be better for W.B. to ask for a change of residence when he was older. She warned: "There is no way to measure the likelihood of serious harm for [W.B.] by forcing a needless change of primary residence at this time in his life."

Dr. Mellor-Crummey described W.B. as "very close to both of his parents" and she noted that he is "more physically affectionate with his father" but "also very close to his mother." She stated: "It is clear that [W.B.] has been well cared for and raised with love by both of his parents."

Dr. Mellor-Crummey recommended that the parents have joint custody and that Mark be given the exclusive rights, among others, to determine W.B.'s primary

9

residence and to make educational decisions on his behalf. She based her recommendations in part on conclusions that Mark had been an effective advocate for W.B. regarding his learning differences, whereas the school and had been more focused on the possibility of ADHD. Dr. Mellor-Crummey also noted that Shelby "repeatedly defers to school personnel" regarding W.B.'s "difficulties and needs" instead of discussing the situation with Mark or making independent decisions. She also concluded that Mark had promoted and supported W.B.'s relationship with Shelby, while Shelby sought to curtail W.B.'s time with Mark, hired Dr. Webb-Ferebee as a therapist for W.B. but ultimately to provide an opinion favorable to her in this litigation, and spoke ill of Mark to and around W.B.

Shelby believed that Dr. Mellor-Crummey was biased against her because her recommendation favored Mark. Shelby also believed that Dr. Mellor-Crummey had disparaged W.B. when she said that if his learning disabilities were not addressed, he would grow to hate school.

After a 15-day bench trial with live and recorded testimony, the trial court entered a final decree appointing Shelby and Mark joint managing conservators of W.B. and giving Mark the exclusive right to designate W.B.'s primary residence in Fort Bend County or a neighboring county, and the exclusive right to make decisions concerning their son's education.

Shelby appealed.

**Analysis**

**I.      The standards of review are deferential to the factfinder.**

We review a trial court's decision regarding conservatorship, including a determination of which conservator will have the exclusive right to establish the child's primary residence and make educational decisions, for an abuse of discretion. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Compton v. Pfannenstiel*, 428 S.W.3d 881, 886 (Tex. App.—Houston [1st Dist.] 2014, no pet.). A trial court abuses its discretion by acting in an arbitrary or unreasonable manner or without reference to any guiding rules or legal principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

"To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion." *Smith v. Payandeh*, No. 01-18-00463-CV, 2019 WL 2528197, at *5 (Tex. App.—Houston [1st Dist.] June 20, 2019, no pet.) (mem. op.). "'An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence,'" or when there is "some evidence of substantive and probative character to support the trial court's decision." *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.]

11

2017, pet. denied) (quoting *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.)).

Legal and factual sufficiency are not independent grounds for assertion of error, but the sufficiency of the evidence is relevant to our determination of whether the court abused its discretion. *Smith v. Karanja*, 546 S.W.3d 734, 737–38 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("In a sufficiency review, appellate courts apply a hybrid analysis because sufficiency-of-the-evidence and abuse-of-discretion standards of review often overlap in family law cases."). Evidence is legally sufficient when it would enable a factfinder reasonably to form a firm belief or conviction that its finding is true.[4] *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). When reviewing the legal sufficiency of evidence on appeal, we consider the evidence in the light most favorable to the trial court's judgment. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). Evidence is factually sufficient when, considering all the evidence, the judgment is not so contrary to the overwhelming

---

[4]     Evidence is legally insufficient when the record shows that: (1) there is a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). When no findings of fact or conclusions of law are filed by the trial court, we imply that the trial court made all fact findings necessary to support the judgment. *Worford*, 801 S.W.2d at 109.

## II. The court's determination of issues involving conservatorship, access, and possession between fit parents is fact intensive and guided by the best interest of the child.

"Suits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). In reviewing a trial court's conservatorship determination, we consider the Legislature's expressed public policy to

> (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
>
> (2) provide a safe, stable, and nonviolent environment for the child; and
>
> (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

13

TEX. FAM. CODE § 153.001(a); *see also Lenz*, 79 S.W.3d at 14. The court presumes that appointment of parents as joint managing conservators is in the best interest of the child. *See* TEX. FAM. CODE § 153.131. "Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators." *Id.* § 153.135. Similarly, the court must specify the rights and duties of conservatorship that each parent may exercise, and it is not required to award these rights equally or require that they be exercised jointly. *See id.* §153.071; *Stillwell v. Stillwell*, No. 03-17-00457-CV, 2018 WL 5024022, at *4 (Tex. App.—Austin Oct. 17, 2018, pet. denied) (mem. op.). When parents are appointed joint managing conservators, the court must designate the parent "who has the exclusive right to determine the primary residence of the child," either with or without geographic limitations. TEX. FAM. CODE § 153.134(b)(1).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002. "The trial court is given wide latitude in determining the best interests of a minor child." *Gillespie*, 644 S.W.2d at 451. The trial court may consider a non-exhaustive list of factors in making this determination, though it need not address all the factors or limit its inquiry to these factors. *See Payandeh*, 2019 WL 2528197, at *5–6 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.

14

1976)). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the act or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

### III. The trial court's decision to name Mark as the parent with the right to designate W.B.'s primary residence and to appoint him exclusive rights to make educational decisions was supported by substantive and probative evidence.

On appeal, Shelby argues that the court abused its discretion because its ruling was not supported by sufficient evidence. She argues that Mark has been controlling, manipulative, and derogatory. She argues that Mark demanded more information without taking initiative to gather information for himself. She argues that Mark's failure to support her during W.B.'s first two years of life is significant. These arguments rely on Shelby's testimony and view of the evidence, which was disputed by Mark's testimony and other evidence.

Our review is limited by two legal standards: (1) because there are no findings of fact or conclusions of law, we must assume that the court found all disputed facts

in favor of its judgment, and (2) the trial court, as factfinder, was the sole arbiter of the credibility of the witnesses and the weight to be given the evidence. *Worford*, 801 S.W.2d at 109; *Nelson*, 127 S.W.3d at 174. What that means here is that we are not permitted to view the evidence from the perspective that Shelby was truthful and Mark was not or to rely only on Shelby's testimony when it is disputed by substantive and probative evidence to the contrary. Similarly, Shelby's argument views certain evidence, which is favorable to her, as most significant, while ignoring other evidence of a substantive and probative nature that was more favorable to Mark. The trial court was not required to assign greater weight to Shelby's testimony that Mark was controlling, failed to seek information, spoke rudely to her, and failed to be supportive six-to-eight years before the final divorce decree. Rather, the trial court had wide discretion to give more weight to the substantive and probative evidence of Mark's involvement in W.B.'s life, advocacy for his learning differences, and encouragement of W.B.'s relationship with Shelby.

Shelby also argued on appeal that Dr. Mellor-Crummey was biased against her and in favor of Mark. In particular, Shelby took issue with Dr. Mellor-Crummey's providing advice to Mark throughout the evaluation process, her conclusion that Shelby had lied, her impression that Mark is aware of his faults, the blame she placed on Shelby for hindering the process, and the conjecture that appeared through her frequent use of the word "may" in her report. The custody

evaluation report is not the judgment, and other evidence of the underlying facts that Dr. Mellor-Crummey relied on was admitted at trial.

Finally, Shelby argues that the *Holley* best-interest factors show that the trial court's decree was an abuse of discretion. The *Holley* factors are not exhaustive, and not all factors may be relevant in every case. *See Smith*, 2019 WL 2528197, at *5–6. In this case, the *Holley* factors do little to differentiate the abilities of these two fit parents. Several *Holley* factors are not relevant in this case which concerns divorced but fit parents: the emotional and physical danger to the child now and in the future; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the act or omissions of the parent. *See Holley*, 544 S.W.2d at 371–72. Several *Holley* factors are neutral because both parents are fit. Both parents have demonstrated that they can provide for the emotional and physical needs of W.B. now and in the future. Both parents have demonstrated competent parenting abilities. Both parents have provided W.B. with a stable home. Both parents have support systems in place to help care for W.B. For example, Shelby has used the programs available through the public school to address W.B.'s dyslexia, and she has relatives nearby who are a support system for her and W.B. Mark has arranged for W.B. to attend a specialized private school that can address his dyslexia and dysgraphia, and his nearby friends, including Jaime and her family, are a support system for him and W.B. Both parents have plans for W.B.

to promote his best interest; Mark's plans include attending the Briarwood School and continuing his practice of having W.B. call Shelby daily or nearly daily when in his possession. Shelby's plans include using the resources available through a well-regarded public school and continuing visitation with Mark as has become routine for this family.

Although W.B. is young—eight years old at the time of trial—the evidence indicates something about his desires. The evidence shows that W.B. loves and both Shelby and Mark, and that his desire was for his parents to stop fighting and get along. The evidence also shows that W.B. was most affected by his parents' discord while in his mother's possession. This weighs in favor of the trial court's decree.

Other factors—namely, public policy of the state—are also relevant. The public policy of this state includes assuring that children have frequent and continuing contact with divorced but fit parents. Evidence at trial showed that Mark encouraged and supported W.B.'s relationship with Shelby by ensuring phone calls when in his possession, inviting Shelby and her parents to birthday parties and other celebrations, agreeing to makeup visitation when inclement weather disrupted her periods of possession, and by considering Shelby's summer vacation when choosing his extended summer possession in order to maximize Shelby's time with W.B. The public policy of the state also includes encouraging parents to share in the rights and duties of raising their child after the dissolution of the marriage. Shelby and her

parents sought to limit Mark's contact with W.B., whereas Mark supported W.B.'s relationship with Shelby. Shelby believed that phone calls from Mark were disruptive, but Mark encouraged W.B. to call his mother. This weighs in favor of the trial court's decree.

Finally, due to W.B.'s learning difficulties, another relevant factor is the parents' abilities to advocate for his educational needs. The custody evaluation process occurred contemporaneously with the educational evaluations of W.B. that the school initiated. Shelby opposed numerous evaluations and interventions because they were not specifically recommended by the school, but Mark reached out to multiple resources to determine what would help W.B. Although Shelby initially sought a referral for an ADHD evaluation from W.B.'s pediatrician, when Dr. Mellor-Crummey sent an ADHD screening questionnaire to W.B.'s school, Shelby directed the school not to cooperate. This, too, weighs in favor of the trial court's decree.

## Conclusion

We conclude that the trial court did not abuse its discretion because it had sufficient evidence on which to base its decision and did not act arbitrarily. We overrule Shelby's issue.

We affirm the trial court's final divorce decree.

19

Peter Kelly
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Goodman.