**Opinion issued October 10, 2024**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

### NO. 01-24-00347-CV

———————————

## IN THE INTEREST OF R.A.L., A CHILD

---

### On Appeal from the 310th District Court
### Harris County, Texas
### Trial Court Case No. 2021-01001

---

## MEMORANDUM OPINION

In this suit affecting the parent-child relationship (SAPCR), Appellant C.V. (Mother) appeals the trial court's order appointing the Department of Family and Protective Services (the Department) as sole managing conservator of "Rachel"[1] and Mother as possessory conservator. In four issues, Mother contends that: (1) the trial

---

[1] To protect the identity of the parties, we refer to them by fictious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

court failed to commence trial on the merits within one year as required by Texas Family Code section 362.401, (2) Texas Family Code section 263.4011 applies to this case and required the trial court to render a final order within ninety days of commencement of trial, (3) the trial court erred in denying appellant's motion to dismiss, and (4) the evidence is legally and factually insufficient to support a sole managing conservatorship or permanent managing conservatorship in favor of the Department. We affirm.

## Background

### A. The Department's Removal of Rachel

Rachel was born in August 2020. When Rachel was five months old, C.V. was hospitalized following gallbladder surgery. While C.V. was in the hospital, Rachel was in the care of J.R.L., Rachel's father (Father).[2] On February 13, 2021, the Department received a referral of physical abuse of Rachel by Father. According to the Department, the report alleged that on February 13, 2021, Father called 911, reporting that Rachel was acting abnormally. Father claimed he had been changing Rachel and playing with her but might have been too rough. Rachel was pale and cold and not breathing regularly. She had bruising on the middle of her chest, near her left armpit along her ribs. Paramedics found multiple bruises on Rachel. Her diaper was soiled. Bruising was found over her buttocks with swelling and redness

---

[2] Father is not a party to this appeal.

of her rectal opening. She was not responsive, and her eyes were not reactive. Father reported that Rachel had been normal three minutes before he called. A few hours later, Father provided a different version of events, stating that he was holding Rachel when he tripped over the dog. Father claimed he tried to catch himself and missed, and Rachel hit her head on Father's shoulder then ricocheted and hit her head on the floor.

According to the Department, Rachel was intubated and taken to the emergency room. She had a GCS (Glasgow Coma Scale) of 4, 15 being normal. She had a subdural hematoma and a right to left midline shift of 5 millimeters. A CT scan at the hospital indicated a spinal fracture of the cervical T1 vertebrae. At the time, it was unknown whether this was an old fracture or caused by the fall. Rachel also had bilateral healing rib fractures. Mother left the hospital against medical advice to be with Rachel. It was reported that Father was behaving appropriately at the time.

On February 26, 2021, the Department filed an Original Petition in Intervention for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship.[3] In its petition, the Department detailed its investigation efforts, including discussions with Rachel's physicians and

---

[3] Although the Department's petition sought the termination of Mother's parental rights if reunification with Mother could not be achieved, the Department ultimately did not seek, and the trial court did not order, termination of Mother's parental rights to Rachel.

interviews with Mother and Father. Child Fatality Investigator L'Jaunet Montgomery noted that on February 14, 2021, Rachel was in the Pediatric Intensive Care Unit at Texas Children's Hospital, where she remained intubated and sedated. A statement taken from the attending physician at the hospital reported that Rachel had a subdural hematoma, rib fractures, and a fractured spine, as well as brain swelling, a brain injury, and bleeding. The attending physician stated that he did not feel the explanation given for Rachel's injuries was consistent with the injuries. The physician concluded that the injuries were "secondary to child abuse."

The Department's petition recounted an interview with Father on February 14, 2021. Father reported that he was playing video games when Rachel became fussy, so he went to change her diaper. Father stated that the dog would not get out of the way, and he slipped while holding Rachel. Father reported that Rachel's head hit the floor and the right side of his body fell on top of Rachel. Father stated that Rachel later "passed out." Father called his brother, who lived in the same apartment complex. Together, they called 911, and according to Father, his brother performed chest compressions with the help of the dispatcher. Father stated that the night before the incident, he and Mother felt Rachel had some breathing difficulty but did not feel it was abnormal because Mother stated it had happened before.

During a follow up interview later on February 14, 2021, Father stated that he "forgot" to tell the investigator part of the story. He said Rachel had a blank stare

when he picked her up from the floor, so he "lightly tossed her in the air to see if she would laugh like she always [did]." Father reported that Rachel did not laugh, and then passed out.

The investigator also interviewed Mother on February 14, 2021, as detailed in the Department's petition. Mother identified other individuals who had cared for Rachel in the past, including Mother's mother (Grandmother) and Father's two brothers. Mother stated that at the time of the incident, she was in the hospital for surgery. Father called, and she did not answer. When she called him back thirty minutes later, he did not answer. Father then called back, and he was crying. Mother reported that Father "kept telling her that he didn't know what was wrong with [Rachel]." At this point, paramedics were checking on Rachel. She asked Father to show Rachel to her, and he flipped the phone's camera. Mother saw Rachel on the bed with paramedics. She saw them give Rachel an oxygen mask. Mother left the hospital and went to see Rachel. Rachel had many medical tubes to assist her and had to be sedated to keep her comfortable.

Mother recounted for the investigator the version of events she was told by Father. Mother stated that Father told her that he picked Rachel up from her swing and she looked sad. Father was trying to get the dog out of the way when he slipped and fell on the baby. Father told Mother that the baby's head hit the wood floor, and

5

his right shoulder landed on her. Mother stated that Father did not watch Rachel by himself often. She denied knowing how Rachel would have received rib fractures.

The investigator documented a call she received from a Texas Children's Hospital social worker, who described Rachel as "broken." The social worker noted several fractures, brain bleeding, and eye hemorrhages, and stated that Rachel essentially had a severe case of shaken baby syndrome. Though Rachel was expected to live, she would be hospitalized for some time. According to the social worker, the parents signed "do not resuscitate" papers for Rachel. She stated that the family was concerned that Father would try and harm himself. The social worker walked Father over to another facility for a psychiatric evaluation, but she was unsure whether Father completed the evaluation.

## B.    Subsequent Proceedings

The trial court conducted a full adversary hearing pursuant to Texas Family Code section 262.201 on March 23, 2021. At the conclusion of the hearing, the trial court determined that the Department met its burden to be appointed temporary managing conservator of Rachel and set the case for a status conference to discuss the Department's proposed family plan of service for Mother. The trial court signed a temporary order appointing the Department as temporary managing conservator of Rachel on April 1, 2021. Following the status conference on May 11, 2021, the trial court approved the Department's proposed family plan of service as filed.

Mother's family plan of service was admitted into evidence at trial. The plan required that she: (1) maintain stable housing and employment for six months; (2) refrain from criminal activity; (3) complete various release forms required by the Department; (4) participate in and successfully complete a psychological evaluation; (5) complete a six to eight-week parenting class for children with specialized needs; (6) attend all court hearings, permanency conferences, and scheduled appointments and provide truthful and accurate information to Child Protective Services (CPS), the courts, and service providers; (7) submit to random drug screening; and (8) provide support for Rachel while in the State's custody, including monetary support and/or items needed by Rachel.

The record contains transcripts from permanency hearings and further proceedings conducted by the trial court on August 31, 2021, December 7, 2021, July 19, 2022, and September 20, 2022. A permanency report filed by the Department on August 29, 2022 in advance of the September 20, 2022 hearing was admitted into evidence at trial. At that time, Rachel had been in a primary medical needs foster home since August 2021. A home study had been completed and denied for Paternal Grandmother; however, a home study had been completed and approved for Maternal Grandmother. The report noted that the Department was "in the process of coordinating services for the medically fragile youth" and that Maternal Grandmother would need to complete training concerning Rachel's feeding tube.

In the permanency report, the Department described Rachel as a "happy baby." The report noted that Rachel was "smiling a lot," babbling, and saying some words. Rachel was approximately two years old at the time. She was learning sounds in speech therapy but experienced developmental delays due to her injuries. The Department noted that Rachel was "engaged in aggressive physical, occupational, [and] speech therapy to assist with the developmental deficiencies."

The Department's goals were unrelated adoption or relative adoption. The Department noted concerns with Mother's protective capacity and her understanding of Rachel's complex medical needs, as well as a concern that Mother did not believe Rachel's injuries were non-accidental. The Department provided a detailed account of Rachel's ongoing medical treatment, including specialized care from neurosurgery, neurology, ophthalmology, audiology, hematology, pediatric surgery, gastronomy, and physical medicine. At the time, Rachel was receiving physical and occupational therapy twice a week. She was taking medication for seizures three times daily.

Regarding Mother's progress with her family plan of service, the Department noted that Mother had completed her psychological evaluation. It was recommended that Mother continue to receive individual psychotherapy services and participate in an online support group. Though Mother's therapist made recommendations and referrals for Mother, at the time of the report, Mother admitted that she had not

followed up on these recommendations. Otherwise, the report indicated that Mother (1) completed the required parenting classes; (2) submitted to an initial drug screening on May 19, 2021, which was negative; (3) met the requirement of six months of stable housing and provided a copy of a lease in her name; (4) met the requirement of six months of stable employment but did not provide any documentation of her earnings from DoorDash; (5) had refrained from criminal activity; (6) was cooperating with the agency and had attended all hearings, permanency conferences, and scheduled visitation; (7) signed the required forms and paperwork; (8) provided support items for Rachel monthly, in the form of clothing and shoes; and (9) declined to be interviewed by law enforcement at the recommendation of her attorney, though the report noted that criminal charges were only pursued against Father.

**C.    Trial**

A bench trial began on May 17, 2023 and continued on March 6, 2024, March 18, 2024, and April 1, 2024. The trial court heard testimony from the following witnesses: (1) Tonyette Rogers, (2) Rachel's foster mother (Foster Mother), (3) Paternal Grandfather, (4) Maternal Grandmother, (5) Elizabeth Garcia, (6) Mother, (7) Dr. Kwabena Sarpong, and (8) Dr. Sarah Risen.

### 1. Caseworker Rogers

The trial court first heard testimony from Tonyette Rogers, the Department caseworker who had been assigned to Rachel's case since the inception of the conservatorship in March 2021. Rogers testified that Rachel came into care due to a "near-fatal case of physical abuse" when Rachel was five months old. When Rogers was first assigned to the case, Rachel was in a traumatic brain injury program at a rehabilitation hospital. Rogers testified that it took three weeks to a month before Rachel was transferred from the initial hospital to the rehabilitation hospital. Rogers visited Rachel in the rehab hospital, where she received regular occupational therapy and physical therapy and was treated by a neurologist, ophthalmologist, hematologist, and audiologist. At that time, Rachel was primarily fed through a feeding tube and received 24-hour nursing care. Rogers testified that Rachel remained in the rehab hospital for three months. Rogers testified that Rachel needed the intensive treatment due to physical abuse. Rogers testified that Father was ultimately identified as the perpetrator who abused Rachel. Rogers stated that Father was charged with serious bodily injury. At the time of Rogers's testimony, Father was awaiting trial.

Rogers testified that she set up visitation for Mother, provided updates about Rachel, and went over the family plan of service with Mother. Mother visited Rachel weekly at the rehab facility. Rogers testified that Mother fed Rachel baby food

against the doctor's recommendations. According to Rogers, Rachel had poor swallow function, and feeding her baby food at that time could have caused her to aspirate or choke. Ultimately, Rogers had to intervene, and Mother was prohibited from visiting Rachel without Rogers's supervision so that Rogers could ensure that Mother did not attempt to feed Rachel.

Rogers testified that Mother minimized the severity of Rachel's injuries. Rogers stated that Mother did not believe that Father hurt Rachel and that Mother stated repeatedly that she did not know whether Father caused the injuries. Rogers testified that Father provided four different versions concerning what happened to Rachel. Rogers acknowledged that Mother was not home with Rachel and Father on the date of the incident because she was in the hospital due to complications from gallbladder surgery. Rogers stated that it was determined that Mother was in the hospital "during the times that it is likely that [Rachel] was injured" and as a result, Mother was not charged. Rogers confirmed that the Department was not currently seeking termination of Mother's parental rights. However, the Department had concern because Mother did not appear protective of Rachel and did not believe that Father harmed Rachel. Rogers testified that this was evidenced by the fact that Mother continued to be in a romantic relationship with Father and had another child with him after Rachel was injured and removed from Mother's care.

According to Rogers, she learned about the new baby on August 31, 2022, after Mother told Foster Mother. Initially, the Department planned to place Rachel with Maternal Grandmother, and Maternal Grandmother and Mother had been learning how to care for Rachel. However, once the Department learned about Mother's second baby with Father (born May 2022), those plans fell apart. Rogers testified that if Mother was still in a romantic relationship with Father, she could not be protective of Rachel and that it is dangerous for Rachel to be around someone who "nearly killed her." Rogers stated that she learned that Maternal Grandmother hid information from the Department concerning the new baby. Maternal Grandmother ultimately advised Rogers that she was present at the birth of the second baby, along with Father. The Department determined that Maternal Grandmother could not be protective of Rachel and subsequently denied her home study.

Rogers then testified concerning Mother's compliance with the family plan of service. She stated that the Department asked Mother to complete a psychological evaluation, parenting classes, and a drug screening; to refrain from criminal activity; to complete certain forms and releases; provide support items; and to follow all the recommendations from any service provider from the results of the assessments. Rogers stated that Mother engaged in the services and provided releases to obtain Rachel's medical records. After obtaining Rachel's pre-incident medical records,

12

Rogers noted that there did not seem to be any concerns from Rachel's pediatricians prior to the injury dates.

Rogers testified that Rachel did not make significant progress in the rehabilitation hospital. She could not sit up, did not meet the eight-month milestones, and still required a feeding tube at that time. She could not track with her eyes or roll from side to side. At that time, Rachel saw some type of specialist every day. Upon her release from the rehab hospital, Rachel was placed in a primary medical needs foster home, where she remained at the time of trial. Rogers testified that this was not an adoptive placement. However, the placement continued to meet Rachel's emotional, medical, and physical needs, and the foster parent would allow Rachel to remain in her placement if the Court granted the State's request.

In March 2021, Rachel still had weekly doctor visits outside the home and therapeutic services at the foster home three times per week. At the time of trial, Rachel had monthly doctor visits. Rogers testified that Mother inquired into Rachel's well-being and care at the time of her foster placement but did not seem to fully understand Rachel's needs. Rogers testified that Mother minimized Rachel's health conditions and referred to Rachel as "doing fine" though she was "very developmentally delayed" and had extensive medical needs. Rogers testified that over time, she saw growth from Mother but never a full understanding of Rachel's extensive medical needs.

Initially, Mother visited with Rachel virtually after her foster placement due to COVID-19. Rogers visited Mother monthly at Mother's residence before Rogers went on leave from February to July 2022. At that time, Mother was living with Maternal Grandmother in an apartment. She then moved to a different apartment but was later evicted. Rogers did not know Mother was pregnant at the time of those visits, nor could she tell someone else was living in Mother's apartment. According to Rogers, Mother denied being in a relationship with Father at that time. This was important to Rogers because she was assessing the safety and stability of her home with respect to Rachel and the potential return of Rachel to Mother. Rogers testified that Mother told her she was no longer in a relationship with Father sometime around August 2021, because this was around the time that Father was charged with injury to a child. When Rogers returned from her leave in August 2022 and learned about Mother's new baby, she attempted to visit Mother to check on the safety and well-being of that child, but she learned Mother had been evicted.

Ultimately, Rogers learned that Mother was living with Maternal Grandmother. This was a concern for Rogers because the Department had already conducted a home study for Maternal Grandmother and was assessing that home as a potential placement for Rachel, and Maternal Grandmother was claiming that Mother was not in the home at the time of the assessment. When Rogers questioned Maternal Grandmother, she claimed she had relocated to a different apartment where

she was living with her sister. This meant the Department had to do another home study.

Ultimately, Rogers testified that neither Mother nor Maternal Grandmother could be protective of Rachel. Rogers testified that protectiveness is determined by "the caregiver actually following the rules and showing an ability to be protective of the child and meeting – understanding and meeting of the medical – severe medical needs and specialized needs of the child." She stated that a court order preventing Mother or Maternal Grandmother from having access to Father would not protect Rachel because both women are dishonest. Further, Father's bond conditions would not protect Rachel or the new baby because Father violated his bond conditions by being present at the new baby's birth.[4] Concerning Mother, Rogers testified that Mother was not protective of Rachel because she was still in a relationship with Father and continued to refer to the "severe, vicious injuries" to Rachel as an accident.

Rogers testified that in August 2022, she found out where Mother was living, though not from Mother. At that time, Rogers was unable to visit Mother's home to determine whether it was a safe and stable environment. She was unable to visit with Mother in August or September 2022. Rogers testified that she reached out to Mother

---

[4] The conditions prohibited Father from being around any child under the age of seventeen.

after she returned from leave in July 2022, but at that time, Mother's attorney instructed her not to speak with Rogers. According to Rogers, she has been unable to obtain information from Mother concerning her living arrangements or work status, though this information is required by the family plan of service. Rogers testified that she learned that Mother, Maternal Grandmother, and Father all lived in the same apartment complex for a period of time.

Rogers testified that the Department was seeking to be named permanent managing conservator of Rachel. Rogers testified that the Department was asking that Mother be named possessory conservator, with limited, supervised access to Rachel. Rogers testified that Mother has a relationship with Rachel. At the time of trial, Rachel was approximately two years old and was able to interact and engage with Mother. Rogers testified that Rachel could not walk and could speak very few words, but she could sit up on her own and stand with assistance. Rogers explained that Rachel's left side is "extremely weak," and she has very limited mobility. Rachel receives speech, occupational, and physical therapy twice weekly in the foster home. Rachel can hear and has some vision but requires regular follow up with her ophthalmologist. Rogers testified that Rachel receives ninety-five percent of her food through a feeding tube; the other five percent consists of "Level 1 purees." Rogers testified that Rachel was being assessed through the school system with the

16

hope that she would start some type of school in a "very small group setting" for the next school year.

Regarding Rachel's foster placement, Rogers testified that Foster Mother had three children in her home, all with specialized medical needs. Foster Mother is able to access educational care for Rachel and has never had any trouble accessing the specialized therapeutic care that Rachel needs. She likewise does not have any trouble interacting with Mother as it relates to visitation. Mother continues to visit with Rachel at the foster home, and Foster Mother provides information to Mother concerning Rachel's medical treatment.

Rogers testified that if Rachel does not continue her current treatment, she will regress. Rogers stated that Rachel needed to be protected and loved. She testified that it was in Rachel's best interest to remain in her current placement and not to be placed with Mother, Father, or Maternal Grandmother.

### 2. Foster Mother

Foster Mother testified that Rachel was approximately eleven months old at the time she was placed in her home. Before becoming a foster parent, Foster Mother worked as a caregiver in another medical needs foster home and was trained by the foster parent (a nurse) and by other nurses in that home. Foster Mother testified that she is licensed as a medically-fragile foster home and that annual training is required to maintain her license. Foster Mother testified that she has to receive training from

17

the hospital for each child she takes into her home, including Rachel. At the time of trial, most of Rachel's appointments were on a yearly or twice-yearly basis. Foster Mother testified that Rachel receives therapeutic treatment in the home every week. Foster Mother stated that Rachel's current diagnoses include a traumatic brain injury and developmental delay, and she requires a feeding tube.

In August 2022, Foster Mother was working with Maternal Grandmother to teach her how to use the feeding tube. Though Maternal Grandmother speaks Spanish, Foster Mother communicated with her through a Spanish-speaking caregiver in the foster home. Foster Mother denied any problems communicating with Maternal Grandmother. At some point in August 2022, Maternal Grandmother and Mother were both in Foster Mother's home, and Mother was asking Foster Mother about all the things that Rachel would need when she returned home. Foster Mother testified that Mother repeatedly asked her about the type of stroller Rachel used. When Foster Mother showed her the stroller, Mother told her that she had another baby at home and wanted to see if Rachel had a double stroller. Mother told Foster Mother not to say anything about the baby. Mother did not tell Foster Mother anything else about the baby. Foster Mother testified that she had virtual visitation with Mother later that summer, but she never heard a baby. Foster Mother testified that she believed Mother asked her not to tell anyone about the new baby because she was afraid it would be taken from her by the Department.

### 3. Paternal Grandfather

The trial court also heard testimony from Paternal Grandfather. He testified that he last saw the new baby in February 2023. Paternal Grandfather stated that Mother and Father came to visit him with the baby, but he denied that they lived together. According to Paternal Grandfather, Father lived with two friends. He last saw them together when they all met with Father's criminal attorney in February 2023. Before that, he saw them together during the holidays. Paternal Grandfather testified that Father and Mother were not presently a couple, but he did not know when they broke up. He did not know whether they were a couple during the holidays. Paternal Grandfather estimated that Mother brought the new baby to visit him once or twice a month after his birth.

### 4. Maternal Grandmother

Maternal Grandmother testified through an interpreter concerning her knowledge of Rachel's injuries. According to her, Mother told her that Father tripped over a dog with Rachel in his arms and that she had several injuries. Maternal Grandmother denied ever speaking with Father about how Rachel was injured. When asked whether she believed Father hurt Rachel, Maternal Grandmother stated: "I don't know." She acknowledged Father's criminal charges and bond conditions and stated that Father visited Mother and the second baby in the hospital. Maternal Grandmother denied that Mother was living with either her or Father at the time of

the baby's birth. She likewise denied that Mother lived in her apartment complex at that time. Maternal Grandmother admitted that she did not tell anyone Mother was pregnant but testified that she did not know she needed to tell anyone about it. Maternal Grandmother testified that she would protect Rachel, would not allow anything bad to happen to her, and would not allow Father to come close to her. Maternal Grandmother testified that Mother was no longer in a relationship with Father and estimated that the relationship ended six or seven months earlier.

### 5. Elizabeth Garcia

Elizabeth Garcia, Maternal Grandmother's sister and Mother's aunt, also testified at trial. Garcia testified that she lived with Maternal Grandmother until they learned that Rachel might be placed in the home. At that time, Garcia moved out to allow space for Rachel. She estimated that she moved out in October or November 2022. Garcia testified that Mother's second baby was born in May 2022 and at that time, Mother and Father lived together in the same apartment complex where Garcia lived with Maternal Grandmother. She recalled that she last saw Mother and Father together when the second baby was around one month old.

### 6. Mother

The trial court then heard testimony from Mother. Recalling the incident leading to Rachel's injuries, Mother testified that Father FaceTimed her and said, "I don't know what's going on with [Rachel.]" Mother pressed him for more

information, and he advised that the paramedics were there. She asked Father to show Rachel to her, and when he did, she saw the baby on the bed with the paramedics. At the hospital, Father eventually gave Mother his version of events but told her not to tell anyone. Father claimed that he tripped over the dog and Rachel landed on the floor. Father told Mother that Rachel "stayed silent" and Mother guessed she fainted. Mother confirmed that she was in the hospital recovering from gallbladder surgery at the time of the incident. Before that, Father had lost his job. She testified that she left Rachel alone with Father "[t]hree or four times." She denied ever noticing that Father was depressed. After Rachel's injuries, Father told Mother that he "just wasn't okay."

Mother testified that Rachel had been in the hospital for a few days before the doctors explained the extent of Rachel's injuries to her. Mother denied that the doctors told her that Father's account was inconsistent with Rachel's injuries; rather, she claimed CPS[5] told her this. Mother testified that she never asked Rachel's doctors whether Father's explanation accounted for Rachel's injuries. Mother admitted that she had access to Rachel's doctors and stated that she has attended appointments in person "once or twice." She testified that she did not know who Rachel's doctors were but knew she could ask Rogers through her attorney.

---

[5]    At times in the record, the Department is referred to as "the agency" or "CPS."

Mother testified that she has lived at her current apartment since November 2022. Before that, she lived in a different unit in the same complex. Mother testified that before November 2022, she lived in Father's apartment by herself. Mother claimed that she could not get an apartment in her name, so she asked Father to give her the apartment. She lived there for "three or four months" after the birth of her second child, and Father paid the rent because she was not working. Mother clarified that she lived in Father's apartment in June, July, and August 2022. In September and October 2022, she lived with her mother in a different unit in the same complex. Mother testified that she pays the rent on her current apartment herself. At the time of trial, Mother had been working in her current job for two days. Before that, she worked in a pediatrician's office. Mother testified that Maternal Grandmother cared for her second child while she worked. Mother works forty hours per week. Mother stated that she had not been in a relationship with Father "for months" but could not recall when they broke up. Mother stated that she "didn't feel comfortable being in a relationship with him after what happened."

**7.    Dr. Sarpong**

The trial court heard testimony from two of Rachel's treating physicians on March 6, 2024.[6] Dr. Kwabena Sarpong was admitted as an expert in child abuse

---

[6]    Between May 17, 2023 and the resumption of trial in March 2024, Mother's mandamus petition was pending in this Court. *See* n.8, *infra*.

pediatrics at trial. He testified that he is an associate professor of pediatrics at Baylor College of Medicine working at Texas Children's Hospital. Dr. Sarpong specializes in general academic pediatrics and child abuse pediatrics. Dr. Sarpong consults on cases in his role as the coordinator for the Child Head Injury Program at Texas Children's Hospital, and he serves on the child abuse pediatrics (CAP) team. Dr. Sarpong treated Rachel upon her admission to Texas Children's Hospital on February 13, 2021. Rachel was brought in by ambulance, and though she was breathing on her own, she was "in almost an unconscious state" and was "very sick." Dr. Sarpong described Rachel's serious and extensive injuries for the trial court, including bleeding and swelling in her brain, bleeding behind her eyes, fractures and injuries in her neck and spine, rib fractures on both sides, and fractures to her elbow and forearm. According to Dr. Sarpong, some of the fractures were healing, but the swelling and bleeding in the brain were new.

Dr. Sarpong testified that Rachel's injuries were classified as nonaccidental by the CAP team, based on the history that was taken, the physical examination, and the radiographical images. Dr. Sarpong stated that unless there was a history of Rachel having been in a high-impact motor vehicle accident, he would have reached the same conclusion. He explained that Rachel's brain, eye, skull, and spine injuries had to be caused by "violent shaking." He testified that the force necessary to cause these injuries would not result from a fall. He opined that the rib fractures were

23

caused by blunt force trauma to the ribs or compression forces. Dr. Sarpong testified that a normal caregiver would have noticed Rachel's forearm and elbow injuries (which he concluded were healing fractures) because the area of injury would have been swollen, there would be some limitation of mobility, and Rachel would have been in pain.

Dr. Sarpong testified that Rachel was in the hospital for six weeks. He stated that the team initially thought they were "going to lose" her. At the time of trial, he had not seen Rachel in a while, but he continued to receive updates on her treatment from his nurse practitioner, who oversees her care.

### 8. Dr. Risen

The trial court also heard testimony from Dr. Sarah Risen, Rachel's neurologist and developmental physician[7] at Texas Children's. Dr. Risen testified that at the time of trial, almost three years post-injury, Rachel has global developmental delay, meaning that all areas of her brain function and development have been impacted. Discussing Rachel's gross motor skills, Dr. Risen testified that Rachel has delays in sitting on her own and walking and has left hemiparesis, meaning that one side of Rachel's body is tighter and weaker than the other. Rachel also experiences visual impairment, though she is not blind. Her current function in

---

[7] Dr. Risen explained that a developmental physician "monitor[s] development" including manifestation of brain function and meeting of developmental milestones.

24

visual motor problem-solving skills is fifty percent. Dr. Risen testified that she expects Rachel will have an intellectual disability.

Independent of her cognition problems, Rachel has "a severe language disorder" as her language is forty percent of what it should be (one hundred percent being average). Dr. Risen testified that she does not expect brain injury recovery and anticipates Rachel will continue to have cognitive disability and language disorder throughout her life. Dr. Risen stated that Rachel will always need support for thinking and language. She estimated that Rachel can say ten to fifteen words. She explained the tightness in Rachel's muscles and body on the left side and described it as akin to a paralysis, though she does have some movement. At the time of her last visit, Rachel was just over three years old and only pulling to stand and walking with both hands held. Dr. Risen described these as eleven-month-old skills.

Dr. Risen testified that it will be even more difficult for Rachel to gain fine motor skills. She is delayed in the use and manipulation of small objects, like zippers or other things used in daily living. Dr. Risen also explained that because of her brain injury, Rachel only has use of her right hand, but she has difficulty even using the right hand for fine motor skills.

Dr. Risen also described Rachel's feeding skills. She testified that Rachel is fed through a feeding tube. Dr. Risen testified that a typical three-year-old without brain injury is feeding fully by mouth. She testified that Rachel's condition is "quite

25

severe" and that often, if someone progresses with feeding, they will progress quickly within the first six months. The fact that Rachel still requires a feeding tube so long after her injury supports the severity of her injury and the impact on her developmental skills. Dr. Risen acknowledged that the brain does have an ability to grow and gain skills, but it requires intense support. She testified that they cannot risk Rachel regressing or losing the gains she has made with her therapy services, including physical therapy, occupational therapy, and speech language therapy, which she receives twice weekly. In addition to this formal therapy, Dr. Risen explained that Rachel's caregivers should be working on these skills daily in order for her brain to have the best chance at continued gains.

Dr. Risen testified that there is a special preschool program for children like Rachel that receives federal and state funding. However, Dr. Risen stated that Rachel would need a strong advocate in the school system to ensure she does not fall through the cracks or fail to get the support she needs. When asked whether Rachel would ever be able to speak for herself, Dr. Risen testified that she hoped Rachel would be able to communicate her wants and needs with assistive devices. She opined that Rachel will not ever be able to live on her own and will always need support. Dr. Risen testified that Rachel needs an "environmentally, developmentally, engaging, nurturing, stimulating home." She also stated that Rachel needed to be protected from future brain injury. Regarding Rachel's behavior, Dr. Risen noted that Rachel

was currently happy and cooperative but was at a "very high risk" for ADHD and impulsivity behavior-type disorders. She explained that emotional dysregulation is "incredibly common" after a traumatic brain injury. Dr. Risen also testified that Rachel is at a lifelong risk for seizures. Rachel experienced seizures in the hospital. At the time of trial, Rachel was no longer on anti-seizure medication, but Dr. Risen stated that the risk was ever-present. She testified that Rachel's caregivers need to be trained on how to handle a seizure. Dr. Risen testified that Rachel comes to the clinic with Foster Mother, and she has not observed Rachel with Mother.

## D.    Conservatorship

Following trial, the trial court signed a final decree on April 29, 2024, appointing the Department as sole managing conservator of Rachel and Mother as possessory conservator. This appeal followed.

**Commencement of Trial on the Merits**

In her first issue, Mother contends that the trial court failed to commence trial on the merits within the time required by section 263.401(a) of the Texas Family Code, which provides as follows:

> Unless the court has commenced the trial on the merits or granted an extension . . . , on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the [SAPCR] filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order.

TEX. FAM. CODE § 263.401(a). Here, the parties agree the relevant dismissal date was September 24, 2022. The trial court ultimately reset trial to September 20, 2022 from an earlier setting. Mother contends that the proceedings on September 20, 2022 amounted to a "sham trial" and did not serve to meet section 263.401(a)'s commencement requirement.

## A.    Standard of Review

We review the action of the trial court in denying a motion to dismiss pursuant to section 263.401 for an abuse of discretion. *See In re Dep't of Fam. & Protective Servs.*, 273 S.W.3d 637, 642–43 (Tex. 2009) (orig. proceeding). We apply a de novo standard of review to a trial court's interpretation of the law. *See id.* A trial court abuses its discretion when it either improperly interprets the law or applies the law incorrectly. *See id.*

## B.    Analysis

Section 263.401 encourages the prompt resolution of suits in which the Department seeks to terminate the parent-child relationship. *In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021). Section 263.401 does this by requiring trial courts to commence trial on the merits within one year from the temporary order appointing the Department as temporary managing conservator. TEX. FAM. CODE § 263.401(a); *In re G.X.H.*, 627 S.W.3d at 292. If the trial court does not commence trial by the dismissal date or extend the dismissal date in accordance with section 263.401(b),

28

the statute dictates that "the trial court's jurisdiction over the suit 'is terminated and the suit is automatically dismissed.'" *In re G.X.H.*, 627 S.W.3d at 292 (quoting TEX. FAM. CODE § 263.401(a)).

Section 263.401 "requires more than a putative call of the case and an immediate recess in order to comply with the statute." *In re D.S.*, 455 S.W.3d 750, 753 (Tex. App.—Amarillo 2015, no pet.). Factors courts have considered in determining when a trial on the merits commenced include "the trial date[] recited in the final order, and whether, in the time between calling the case and recessing on the putative commencement date, (a) preliminary matters were addressed, (b) the parties announced 'ready,' (c) opening statements were made, (d) witnesses were sworn, (e) a party called a witness to testify, and (f) exhibits were admitted." *In re J.L.J.*, 645 S.W.3d 294, 295–96 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (internal footnotes and citations omitted); *see also In re D.S.*, 455 S.W.3d at 753 (suggesting that to commence trial for purposes of section 263.401, "at a minimum[,] the parties should be called upon to make their respective announcements and the trial court should ascertain whether there are any preliminary matters to be taken up").

Here, on September 20, 2022, the parties appeared for their trial setting, initially before the associate judge. Though Mother's briefing focuses on the proceedings that occurred before the presiding judge, certain preliminary matters

29

were first addressed by the associate judge on September 20, 2022. For example, the associate judge considered a motion to withdraw filed by Father's attorney ad litem. At the time of the September 20, 2022 trial setting, father was "under felony indictment for serious bodily injuries to [the] child." His court-appointed attorney had been unable to "communicate with her client and [could not] represent him." Father had been provided notice of his counsel's motion to withdraw, but counsel had not received any response from Father. The associate judge ultimately granted the motion to withdraw of Father's court-appointed counsel.

Also in front of the associate judge, counsel for Mother acknowledged that the upcoming September 24, 2022 dismissal date was four days later and advised the court that the parties would need "at least a three[-]day trial setting" for the case. The Department expressly acknowledged that it was "[not] proceeding on termination today." Further, the associate judge stated that the trial court "would like to start the trial today, start and recess to allow you folks – I really want you to mediate." The associate judge then considered Mother's objection to commencing trial in front of the associate judge and sent the parties to the presiding judge.

According to Mother, "the parties were sent to the [p]residing [j]udge to commence a trial on the merits, for the specific purpose of extending the dismissal date." The trial court took announcements from the parties, discussed Mother's objection to appearing for "trial" in front of the associate judge, then "call[ed] th[e]

30

matter to trial in order to hear brief testimony to [e]nsure the Court remains in [compliance] of the September 24, 2022 mandatory extended dismissal date in this case."

Mother argues that the September 20, 2022 hearing was "a sham to circumvent the statutory dismissal." Mother contends that, while the State announced "ready" for trial, "no exhibits had been exchanged or tendered to the court reporter or other parties by the State," and "the State had not produced a designation of experts or so much as a witness list." Similarly, the attorney ad litem for the child announced "ready" for trial, but at that time, "no exhibits had been exchanged or tendered to the court reporter or other parties by the Attorney Ad Litem," and "no designation of trial or expert witnesses had been tendered per the Texas Rules of Civil Procedure."

Mother contends that for those reasons, she "announced not ready based on outstanding discovery issues and the need for clarity to defend Mother's parental rights from [t]ermination." Despite this, the trial court called the matter for trial. The Department called Caseworker Rogers to testify. Before Rogers testified, the trial court took "judicial notice of a few documents," including Father's acknowledgment of paternity and the August 29, 2022 permanency report. At that time, counsel for the Department proceeded to question Rogers:

Q.    State your name for the record.

31

A. Tonyette Rogers.

Q. You are the case worker assigned to this child; is that correct?

A. Correct.

Q. Where is she currently placed?

A. In a primary medical needs foster home.

Following an interruption from the interpreter, the trial court asked the Department to "start over":

Q. Miss Rogers, state your name for the record.

A. Tonyette Rogers.

Q. You are the case worker assigned to the child; is that correct?

A. Yes.

Q. And where is this child currently placed?

THE COURT: All right. Miss Carlson [counsel for the Department], the Court is going to recess this case now. . . . We are reset to November 4th at 9:00 a.m. This case is going to be -- the trial is continued to . . . November 4th.

Mother ultimately filed a motion to dismiss based in part on section 263.401. The trial court denied Mother's motion.[8]

---

[8] The denial of Mother's motion was the basis of a separate mandamus proceeding. We denied Mother's petition for writ of mandamus. *In re Vallejo*, No. 01-23-00594-CV, 2023 WL 5615887 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023) (orig. proceeding).

Mother compares this case to *In re D.S.*, 455 S.W.3d 750. In that case, the Amarillo Court of Appeals determined that the trial court failed to meet the commencement requirement of section 263.401 where (1) the parties never answered whether they were ready for trial; (2) the trial court immediately called counsel for the parties to the bench, inquired as to how long trial would take, and upon receiving an answer, "immediately 'recessed' the hearing and instructed counsel to obtain a subsequent trial date from the court coordinator"; (3) no substantive action was taken regarding the case; and (4) no preliminary matters or motions were heard. *Id.* at 752.

Contrary to Mother's arguments, this case is more akin to those where courts have found that the commencement requirement was satisfied. *See, e.g.*, *In re. T.E.*, No. 09-23-00021-CV, 2023 WL 3749344, at *2–3 (Tex. App.—Beaumont June 1, 2023, pet. denied) (mem. op.) (distinguishing *In re D.S.* and concluding commencement requirement met where court called case for trial, all parties agreed on record to commence that day and return to resume trial to conclusion, Department called witness, and "some testimony was offered" before case was recessed and later resumed); *In re H.B.C.*, No. 05-19-00907-CV, 2020 WL 400162 at *12, 14 (Tex. App.—Dallas Jan. 23, 2020, no pet.) (mem. op.) (holding trial had commenced where trial court called case, counsel for all parties announced ready, pretrial matters were addressed, and witness was sworn in and gave brief testimony prior to recess);

*In re R.J.*, 579 S.W.3d 97, 109–10 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (determining trial on merits commenced after witnesses were sworn, parties announced ready, and witness for Department "briefly testified" before trial court recessed); *In re R.F.*, No. 04-17-00582-CV, 2018 WL 1308542, at *1 (Tex. App.— San Antonio Mar. 14, 2018, no pet.) (mem. op.) (determining trial commenced though appellant announced not ready; trial court addressed pretrial motions and Department called witness who testified briefly before trial court recessed).

Here, unlike in *In re D.S.*, the trial court called the case to trial, addressed preliminary matters (including a motion to withdraw and the status of mediation) heard the parties' announcements, and swore in witnesses.[9] The Department then called its first witness, who testified briefly before the trial court recessed the case. This was "more than a putative call of the case and an immediate recess in order to comply with the statute." *See In re D.S.*, 455 S.W.3d at 753. We therefore conclude that the record contains sufficient information to establish that trial on the merits commenced on September 20, 2022. *See In re R.J.*, 568 S.W.3d at 747; *In re T.E.*, 2023 WL 3749344, at *2–3; *In re R.F.*, 2018 WL 1308542, at *1; *In re H.B.C.*, 2020 WL 400162, at *13–14.

We overrule Mother's first issue.

---

[9] In addition to Rogers, the court swore in Maternal Grandmother, who was to testify once trial resumed.

34

**Section 263.4011 and Motion to Dismiss**

In her second and third issues, Mother first argues that Texas Family Code section 263.4011 applies to this case and then contends that the trial court erred in denying her motion to dismiss on those grounds.

Section 263.4011(a) provides that "[o]n timely commencement of the trial on the merits under Section 263.401, the court shall render a final order not later than the 90th day after the date the trial commences." TEX. FAM. CODE § 263.4011(a). Here, it is undisputed that the trial court's final decree was signed on April 29, 2024.

As Mother acknowledges, section 263.4011 of the Family Code was enacted in 2021 and went into effect on September 1, 2021. Act of May 15, 2021, 87th Leg., R.S., ch. 8 (H.B. 567), § 16. Further, the Department filed the instant case on February 26, 2021. Despite this, Mother contends that "nothing in the statute or legislative notations of Texas Family Code Section 263.4011 limits the applicability to cases after September 1, 2021." Mother is incorrect. As the State points out in its briefing, the Act adding section 263.4011 specifically states as follows:

> The changes in law made by this Act apply only to a suit filed by the Department of Family and Protective Services on or after the effective date of this Act. A suit filed by the department before that date is governed by the law in effect on the date the suit was filed, and the former law is continued in effect for that purpose.

*Id.* § 15. Thus, section 263.4011 only applies to suits filed on or after September 1, 2021. *See id.* §§ 15, 16. Texas case law also supports such a conclusion. The San

Antonio Court of Appeals rejected a similar argument in *In re E.A.R.*, 672 S.W.3d 716 (Tex. App.—San Antonio 2023, pet. denied), holding that section 263.4011 did not apply to a termination petition filed on February 4, 2021—before the section's effective date. *Id.* at 720. Similarly, in *In re A.P.*, No. 10-22-00008-CV, 2022 WL 1417356 (Tex. App.—Waco May 4, 2022, pet. denied) (mem. op.), the Waco Court of Appeals likewise concluded that section 263.4011 did not apply in a case "initiated in September of 2020." *Id.* at *3–4.

Because the Department filed its petition prior to section 263.4011's effective date, the section does not apply to the instant case. We therefore overrule Mother's second and third issues.

## Sufficiency of the Evidence

In her fourth issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's appointment of the Department as sole managing conservator of Rachel.

### A. Standard of Review and Applicable Law

Conservatorship determinations made after a bench trial are "subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). To determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without

reference to any guiding rules or principles, that is, whether its decision was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). "An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence," nor does an abuse of discretion occur so long as there is some evidence of substantive and probative character to support the trial court's decision. *In re M.M.M.*, 307 S.W.3d at 849 (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding), and *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002)).

Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds of error, but rather, relevant factors in assessing whether the trial court abused its discretion. *E.g.*, *Moore v. Moore*, 383 S.W.3d 190, 198 (Tex. App.—Dallas 2012, pet. denied); *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

In conducting a legal sufficiency review in conservatorship cases, an appellate court reviews all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 810, 827 (Tex. 2005); *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). If the evidence would enable reasonable, fair-minded people to differ in their conclusions, then the fact-finder's determination must stand. *City of Keller*, 168 S.W.3d at 822; *In re J.J.G.*, 540 S.W.3d at 56. We cannot substitute our judgment for the factfinder's as long as the evidence lies within this zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822; *In re J.J.G.*, 540 S.W.3d at 56.

In a factual sufficiency review, we examine the evidence in a neutral light and affirm so long as the evidence supporting the trial court's findings is not so weak as to be clearly wrong and manifestly unjust. *See In re J.J.G.*, 540 S.W.3d at 62 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). The trial court is in a better position to decide custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied) (citing *Martinez v. Molinar*, 953 S.W.2d 399, 403 (Tex. App.—El Paso 1997, no writ)).

Section 263.404 of the Family Code governs a trial court's appointment of the Department as a child's managing conservator without terminating parental rights. *In re J.J.G.*, 540 S.W.3d at 57. A trial court may appoint the Department as managing conservator without terminating parental rights if it finds by a preponderance of the evidence that:

(1)  appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development; and

(2)  it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator.

TEX. FAM. CODE § 263.404(a); *In re J.J.G.*, 540 S.W.3d at 57, 61. In addition, the trial court must consider whether the child will reach the age of eighteen in not less than three years, the child is twelve years of age or older and has expressed a strong desire against termination or has continuously expressed a strong desire against adoption, and the needs and desires of the child. TEX. FAM. CODE § 263.404(b).

Impairment of the child's physical health or emotional development can only be proven by showing that specific acts or omissions of the parent demonstrate that awarding her conservatorship would result in physical or emotional harm to the child. *See Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *In re R.L.*, Nos. 01-16-00851-CV, 01-16-00852-CV, 01-16-00875-CV, 2017 WL 1496955, at *14 (Tex. App.—Houston [1st Dist.] Apr. 21, 2017, no pet.) (mem. op.). Acts or

omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by a parent. *In re R.L.*, 2017 WL 1496955, at \*15. Other considerations may include parental irresponsibility, mental health problems, frequent moves, bad judgment, and an unstable lifestyle that puts the child at risk. *Id.* These circumstances need not rise to a level that warrants termination of parental rights, which is governed by a higher standard of proof, to support a finding that the appointment as a conservator would impair the child's physical health or emotional development. *See In re J.A.J.*, 243 S.W.3d at 615–16; *In re J.J.G.*, 540 S.W.3d at 60–61.

**B.    The Evidence Supporting the Trial Court's Final Decree**

Here, the trial court made the following relevant findings related to a permanent managing conservatorship for Rachel: (1) the appointment of a parent or both parents as managing conservator would not be in the best interest of Rachel, because the appointment "would significantly impair the child's physical health or emotional development"; (2) it would not be in the best interest of Rachel to appoint a relative of the child or another person as managing conservator; and (3) appointment of the Department as sole managing conservator is in the best interest of Rachel.

From the testimony presented at trial, it appears the Department's primary concern was that neither Mother nor Maternal Grandmother demonstrated that they

40

could be protective of Rachel. Though the testimony conflicted as to when the relationship between Mother and Father ended, the fact that Mother and Father had another child together during the pendency of this case demonstrates that the relationship continued after Father's suspected abuse of Rachel. And Father's presence at the hospital to visit Mother and his second child in violation of his bond conditions, with the full knowledge of Mother and Maternal Grandmother, further evidences their unwillingness or inability to protect Rachel from Father. Additionally, neither Mother nor Maternal Grandmother would acknowledge the likelihood that Father abused Rachel. Mother also testified that Father got her an apartment in his name and paid the rent for "three or four months" after their second child was born in May 2022. Mother only left the apartment after Father said he could no longer afford it. This demonstrates that even when Mother and Father were no longer in a relationship, she still relied on him for support. *See In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.) (considering parental irresponsibility, bad judgment, and chaotic lifestyle "that has put and will continue to put the child at risk"); *F.A.B. v. Dep't of Fam. & Protective Servs.*, No. 01-10-00930-CV, 2012 WL 5310024, at *5 (Tex. App.—Houston [1st Dist.] Oct. 25, 2012, no pet.) (mem. op.) (noting "record reveal[ed] a history of abusive or assaultive conduct by the family or others who had access to the home"); *see also Holley v.*

41

*Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (considering current and future physical and emotional danger to child in determining best interest).

No evidence demonstrates that Mother had the abilities necessary to care for the complex physical and medical needs of Rachel. To the contrary, Rogers testified that Mother minimized Rachel's health concerns and developmental delays and attempted to feed Rachel baby food despite warnings that this could cause Rachel to aspirate or choke. Mother testified that she has never asked Rachel's physicians if Father's version of events was consistent with Rachel's injuries, that she did not know the names of Rachel's physicians, and that she relied on Foster Mother to relay information regarding Rachel's treatment to her. Mother did not explain how she planned to ensure Rachel continued to receive her weekly therapy treatments, nor how she would care for Rachel and work her full-time job. Further, at the time of her testimony, Mother had only been working at her job for two days. *See Holley*, 544 S.W.2d at 371–72 (considering current and future needs of child, parental abilities of those seeking custody, plans for the child of those seeking custody, and stability of home or proposed placement in determining best interest).

Finally, despite her significant medical needs, Rachel is doing well in her current placement. Though not an adoptive placement, Foster Mother testified that Rachel could remain in her care. *See* TEX. FAM. CODE § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the

child's best interest."). Rachel's caregivers are meeting her medical, emotional, and physical needs and will do so in the future. *See Holley*, 544 S.W.2d at 371–72 (considering child's current and future physical and emotional needs in determining best interest). Foster Mother avails herself of programs to assist and promote the best interest of Rachel, and the placement is stable. *See id.* (considering availability of programs to assist parties in determining best interest); *see also* TEX. FAM. CODE § 263.307. Foster Mother has demonstrated a commitment to helping Rachel excel and supporting her needs. *See Holley*, 544 S.W.2d at 371–72 (considering parental abilities in determining best interest).

After considering the evidence in the light most favorable to the judgment, we conclude that the evidence is legally sufficient to support the trial court's findings that the appointment of Mother as the managing conservator for Rachel would significantly impair the child's physical health or emotional development and that the appointment of the Department as the sole managing conservator of Rachel would be in the child's best interest. And after considering all of the evidence in a neutral light, we conclude that the evidence is factually sufficient to support the trial court's findings that the appointment of Mother as the managing conservator for Rachel would significantly impair the child's physical health or emotional development and that the appointment of the Department as the sole managing conservator of Rachel would be in the child's best interest. Accordingly, we hold

that the trial court did not abuse its discretion in appointing the Department as the sole managing conservator for Rachel.

## Conclusion

Having overruled each of Mother's issues, we affirm.


Amparo Monique Guerra
Justice

Panel consists of Chief Justice Adams and Justices Goodman and Guerra.